Konrads KALEJS, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 92–2198.

United States Court of Appeals,
Seventh Circuit.

Argued April 30, 1993.

Decided Nov. 17, 1993.

Rehearing Denied Dec. 30, 1993.

Charles W. Nixon (argued), Chicago, IL, for petitioner.

Fred Foreman, U.S. Atty., Office of the U.S. Atty., Crim. Div., Chicago, IL; William J. Howard, David J. Kline, Dept. of Justice, Office of Immigration Litigation; Richard L. Thornburg, U.S. Atty. Gen., Office of the U.S. Atty. Gen., Washington, DC; Samuel Der–Yeghiayan, I.N.S., Chicago, IL; and Ronnie L. Edelman, and Betty–Ellen Shave (argued), Dept. of Justice, Office of Sp. Investigations, Washington, DC, for respondent.

Before CUMMINGS and MANION, Circuit Judges, and EISELE, Senior District Judge.*

CUMMINGS, Circuit Judge.

The government seeks to deport eighty-year-old Konrads Kalejs, an alleged Nazi collaborator who has now lived in the United States for thirty-four years. After Germany's defeat, Kalejs fled to Australia. He came to the United States in 1959 claiming to have been a farm laborer during the war. Whatever his real occupation then, Kalejs has been a financial success in the United States: he owns four homes, had assets in excess of a million dollars in the mid–1980s, and was able to post a $750,000 bond to secure his freedom while this case was pending. The Justice Department first set its sights on Kalejs in late 1984. But when he was about to be nabbed, he took $350,000 in cash and fled to Canada and Australia. When Kalejs returned to the United States, he tried to assume a new identity and managed to elude capture for six months. He was finally arrested in Florida on April 19, 1985; government agents expended 1,500 hours in the search. In the more than eight years since his arrest, Kalejs has bitterly disputed the charges that he was an officer in a pro-Nazi unit that killed tens of thousands of people, and that he assisted in other persecutions as an army officer, policeman and concentration camp guard.

Both an immigration judge and the Board of Immigration Appeals ("BIA")—sitting in Chicago after Kalejs was granted a change of venue—considered the case in extraordinary detail, found Kalejs' denials unconvincing, and held that he should be deported under 8 U.S.C. §§ 1251(a)(1)(A), 1251(a)(1)(B) and 1251(a)(4)(D).[1] If he is deported, Kalejs will return to Australia where he retains citizenship. We have jurisdiction to hear direct appeals of BIA decisions under 8 U.S.C. § 1105a(a). Kalejs presses upon us essentially three arguments: that he did not commit war crimes, that he did not lie on his visa application to enter the United States (or rather, that the lies he told were immaterial), and that prosecutors relied on inherently untrustworthy evidence—depositions and documents salvaged from the archives of the former Soviet Union—and then compounded the error by denying him due process. We affirm the BIA's decision in all respects.

Konrads Kalejs was born on June 26, 1913, in Riga, Latvia. He was educated as a professional soldier and served as a lieutenant and first lieutenant in the Latvian military. In 1940, the Russians overran Latvia. Kalejs salvaged his military career by joining the conquering Red Army, but a year later the Russians were themselves pushed out of Latvia by the Nazis, whose forces were driving relentlessly toward Russia on the eastern

* The Honorable Garnett Thomas Eisele, Senior District Judge of the Eastern District of Arkansas, is sitting by designation.

1. The sections were previously numbered as 8 U.S.C. §§ 1251(a)(1), (2) and (19).
  8 U.S.C. § 1251(a)(1)(A) provides:
    Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens excludable by the law existing at such time is deportable.
  8 U.S.C. § 1251(a)(1)(B) provides:

Any alien who entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or any other law of the United States is deportable.
  8 U.S.C. § 1251(a)(4)(D) provides:
    Any alien described in clause (i) or (ii) of section 1182(a)(3)(E) of this title is deportable.
  See *infra* for the text of 8 U.S.C. § 1182(a)(3)(E).

front. Again Kalejs sided with the victors; he deserted his Red Army comrades and, according to the evidence presented here, joined a pro-German force called the Latvian Auxiliary Security Police. The unit was also known as the Arajs Kommando after its leader Viktors Arajs, who was convicted by a German court and sentenced to life imprisonment in 1979 for committing wartime atrocities. (Arajs died in prison.) According to the Justice Department, from July 1941 until at least June or July of 1944, Kalejs was a company commander and first lieutenant in the Arajs Kommando.

The Nazis' policy in Latvia (as elsewhere) was to murder all Jews, Gypsies and many Communists. After the German army swept through an area, a mobile killing crew would follow shortly, hoping to catch victims unaware. These mobile killing units were called the Einsatzgruppe or, in Latvia, the Einsatzkommando. According to the government's expert witness in the case against Kalejs, Dr. Raul Hilberg, a renowned Holocaust scholar and professor of political science at the University of Vermont, the Einsatzkommando assigned to Latvia had just 170 members. The logistics of attempting the systematic annihilation of the 70,000 Jews in Latvia prompted the Einsatzkommando to rely on bands of local soldiers. The Arajs Kommando was such a group. As a company commander, Kalejs was one of six or seven officers who were second in command to Arajs; he had a hundred men or more under his direction.

Dr. Hilberg testified that according to German documents, the Einsatzkommando with the help of the Arajs Kommando and similar local groups managed to murder 29,000 people (90 percent of them Jewish) before August 10, 1941. A few months later, in order to make room in Riga's Jewish ghetto for the thousands of Jews whom Hitler had shipped out of Germany, 27,800 Jews were shot in the woods near Riga in the space of three days. By January 1942, only 4,000 of the 70,000 Jews who were in Latvia at the beginning of the war were still alive. The Arajs Kommando working with the Einsatzkommando was responsible for more than half of these killings.

Kalejs and his unit had two other duties besides killing Jews in the Riga ghetto. Outside of Latvia (usually in Russia) the Arajs Kommando joined the German SS in so-called anti-partisan activity, which was little more than a cover for arresting and murdering civilians. In addition, the Arajs Kommando under the leadership of Kalejs served as guards at the Salaspils concentration camp. The conditions there were brutal, although Salaspils was a labor camp whose inmates died primarily from inhumane conditions or being shot while trying to escape, rather than a killing camp such as Auschwitz where the prisoners were systematically murdered in gas chambers. The Arajs Kommando was charged with guarding work details and preventing escapes at Salaspils.

■ The United States has the authority to deport Nazi collaborators for assisting in the persecution of innocents because of their race, religion, national origin or political opinion, 8 U.S.C. § 1182(a)(3)(E), and for lying about a material fact on immigration forms, *Fedorenko v. United States*, 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686. The government alleges that Kalejs is guilty of both. We will deal with each accusation in turn although the issues are married because of course the reason former Nazis lie on their immigration forms is that they would not gain admission if they told the truth about their war crimes. Stephen J. Massey, *Individual Responsibility for Assisting the Nazis in Persecuting Civilians*, 71 Minn.L.Rev. 97, 106 (1986). The Holtzman Act confers on the United States the power to deport, or keep out in the first instance:

> Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—
>
> (I) the Nazi government of Germany,
>
> (II) any government in any area occupied by the military forces of the Nazi government of Germany,
>
> (III) any government established with the assistance or cooperation of the Nazi government of Germany, or
>
> (IV) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion * * *.

8 U.S.C. § 1182(a)(3)(E). Assigning personal responsibility in a military regime is complex, particularly with regard to Holocaust era crimes because the Nazis' murderous proficiency insured there would be few witnesses. In only a handful of these cases are there people who can place the accused at the scene of a specific crime with a gun in his hand. The same is true here. The Holtzman Amendment's non-criminal provision thus makes *assistance* in persecution an independent basis for deportation, and assistance may be inferred from the general nature of the person's role in the war; therefore, the atrocities committed by a unit may be attributed to the individual based on his membership and seeming participation. The Supreme Court suggested in *Fedorenko,* for example, that an armed guard at a concentration or labor camp assisted in persecution under the statute, no matter that it could not be proved he committed a specific atrocity and despite the fact that the guard acted at the direction of a camp commandant. 449 U.S. at 512 n. 34, 101 S.Ct. at 750 n. 34. As we recently said,

> If the operation of [a concentration] camp were treated as an ordinary criminal conspiracy, the armed guards, like the lookouts for a gang of robbers, would be deemed coconspirators, or if not, certainly aiders and abettors of the conspiracy; and no more should be required to satisfy the noncriminal provision of the Holtzman Amendment that makes assisting in persecution a ground for deportation.

*Kairys v. Immigration and Naturalization Service,* 981 F.2d 937, 943 (7th Cir.1992), certiorari denied, —— U.S. ——, 113 S.Ct. 1832, 123 L.Ed.2d 460. See also *Schellong v. Immigration and Naturalization Service,* 805 F.2d 655, 660, 662 (7th Cir.1986), certiorari denied, 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199; *United States v. Kairys,* 782 F.2d 1374, 1377 n. 3 (7th Cir.1986), certiorari denied, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703.

According to testimony, Kalejs was not "merely" a guard at a concentration camp but the commander of such guards. In addition, he was a key officer in a unit that has been proved by eyewitness testimony and Nazi-era documents to have killed tens of thousands of innocents. The charges levelled against Kalejs, if true, undoubtedly qualify as assistance in persecution under the Holtzman Act. Kalejs' status as an officer in the Arajs Kommando probably qualifies as ordering, inciting and participating in persecution under the Act as well. Dr. Hilberg's expert opinion was that, in this instance, attributing the atrocities of the group to the individual is logical because an officer in the Arajs Kommando would have "as a matter of course" participated in the slaughter. Kalejs' primary defense, then, is to deny membership in the Arajs Kommando. He argues that the immigration judge and BIA relied on inherently untrustworthy evidence and that, even on its own terms, the evidence does not establish his guilt.

The government produced a number of documents from 1941 to 1945 referring to Konrads Kalejs as a member, company commander or first lieutenant of the Arajs Kommando. One was a form submitted to the University of Riga on November 28, 1941, and signed by the head of the unit, Viktors Arajs, that said, "First lieutenant Konrads Kalejs has been a member of the Latvian Auxiliary Security Police from 29 July, this year, to the present." Recall that the Latvian Auxiliary Security Police was the official name of the Arajs Kommando. Another form submitted by the deputy chief of the Kommando on November 5, 1942, provides that "First Lieutenant Konrads Kalejs born on 26 June 1913, has been in the service of the Latvian Security Section since 30 July 1941 and was at the Eastern front between 14 February 1942 and 27 April 1942." Even more compelling is a note in Kalejs' handwriting, dated "Riga, 15 May 1943," to the university registrar that says, "I hereby inform you that I am in the service of the Commander of the Security Police and SD of Latvia—in the Latvian Security Section as a company commander" (App. at 56). The record in this case is strewn with similar documents including certified copies of officers'

identification badges. The United States also produced three witnesses who testified that Kalejs was a company commander and first lieutenant in the Arajs Kommando; four witnesses placed Kalejs as a head guard at the Salaspils concentration camp.

Kalejs first took the Fifth Amendment at his deportation hearing. When he decided to testify, Kalejs explained these damning documents by saying that, in order to continue his studies at the university, he needed to demonstrate participation in the German war effort. A friend helped him procure these affidavits, petitioner maintains, and told him what to write. He did not know Viktors Arajs and did not learn the true nature of the Arajs Kommando until the war was over. He was also utterly unaware that Jews, Gypsies and Communists were being executed in mass numbers in Latvia. As Kalejs tells it, he was merely a student in early 1942 when he joined a police unit of skiers and was sent to the eastern front. Then, in late 1942, he developed an ulcer and was out of commission for twenty-seven or twenty-eight months, although he continued to receive his military salary from the Germans. He continued to study and worked part time on a farm. In 1943 he married and lived with his parents in Riga. He was called to report to the Latvian Legion in 1944 and was sent for training in late 1944 and early 1945 to Germany. At the war's end he became police chief in a displaced persons' camp.

The immigration judge and the BIA did not believe Kalejs' denials and neither do we. He does not explain, for example, how he so easily obtained affidavits identifying him as not merely a member but an officer of the Arajs Kommando, or why he didn't simply obtain a certificate from the unit he claimed to be a member of. It is also incredible that the Germans would have continued to pay the military salary of a Latvian soldier for two-and-a-half years while he was recuperating from an ulcer, studying and laboring on a farm. Kalejs claims to have had no knowledge of the mass executions of Jews outside Riga, but according to expert testimony the subject had set the town abuzz at the time. And Kalejs admitted to serving under a general who was head of the Einsatzgruppe, the mobile killing unit, in Latvia, although he later tried to distance himself from this testimony. Finally, there are multiple witnesses including other members of the Arajs Kommando who placed Kalejs in the unit as an officer as well as at Salaspils concentration camp. Several of these witnesses identified Kalejs as the man they knew from an array of 250 photographs, a stunning indictment given the fifty years that have passed since any of these people had seen the accused. We hold, therefore, that the BIA was amply justified in concluding that Kalejs assisted in the persecution of people because of their race, religion, national origin or political beliefs within the meaning of the Holtzman Act.

■ The second ground for deporting Kalejs is his fraudulent statements on immigration forms. On December 3, 1958, Kalejs appeared before an American vice consul in Melbourne, Victoria, Australia, and signed a statement (swearing that he was telling the truth) that listed his activities since the age of sixteen. The twenty-fifth question on the visa application asked for a list of residences and occupation(s). Kalejs wrote that he was a member of the Latvian Army from 1929 to 1941, but that from 1941 to 1944 he was a farm laborer and lived in Nurmuiza, Talsi, Latvia. Petitioner admits in his brief that this information was false or at least incomplete but makes the extraordinary argument that there was no space on the form to give an accurate description. Even Kalejs admits that he received a military salary throughout the war; he could have said "soldier" or "military" or "army" in as little space as "farm laborer." And given our conclusion that Kalejs was actually an officer in a brutal pro-Nazi military unit, the description "farm laborer" was not even a partially accurate description of Kalejs' activities during the war. The real reason Kalejs decided to lie, of course, was not an absence of space on the visa application—after all, he also had a personal interview with American consular officials during which he could have given a more expansive and accurate representation of his war years—but the fear that he would not be allowed to enter the United States if his true involvement were known. Kalejs admitted as much in a 1984 deposition taken before he had obtained counsel or attempted

to flee from American authorities and deportation hearings.

■ The government may deport or exclude "[a]ny alien who, by fraud or wilfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or entry into the United States * * *." 8 U.S.C. § 1182(a)(6)(C)(i). This statute requires that the government prove by clear and convincing evidence four things: (1) the person misrepresented or concealed some fact; (2) the person did so willfully; (3) the fact was material; and (4) the misrepresentation resulted in the person obtaining a visa, documentation or entry into this country. *Kungys v. United States*, 485 U.S. 759, 767, 108 S.Ct. 1537, 1544–45, 99 L.Ed.2d 839. There is no question in this case that Kalejs' visa applications violated prongs one and two; that is, Kalejs misrepresented facts and he did this willingly. In fact, Kalejs admitted as much on two occasions. The issue, then, is whether petitioner's lies were material and whether they resulted in his acquisition of the U.S. visa. Under *Kungys*, a false statement is material if it had a natural tendency to influence the decisions of the Immigration and Naturalization Service. *Id.* at 772, 108 S.Ct. at 1547. Once materiality is proved by clear and convincing evidence, the government is deemed to have established a rebuttable presumption that the person got his visa because of the misrepresentation. The accused may rebut the presumption by showing through a preponderance of the evidence that the statutory requirement for admission was met regardless of the falsehood. *Id.* at 777, 108 S.Ct. at 1549–50. This is most definitely not a "but for" analysis, according to the Court; that is, the government need not establish that "but for" the misrepresentation, the person would have been denied entry. *Id.* at 777–779, 108 S.Ct. at 1549–51. Obviously, since materiality has been defined as the tendency to influence immigration officials, it is intertwined with the question of whether the person obtained a visa because of the misrepresentation. In essence, the materiality requirement is designed to exclude trivial or irrelevant misstatements and the obtaining or procuring requirement is designed to measure how heavily officials relied on the falsehood.

■ Kalejs argues that *Kungys* does not apply to him because that decision was not rendered until all the evidence was submitted in his case. This is not correct. *Kungys* was actually decided on May 2, 1988, three months before Kalejs began his defense. Even so, *Kungys* would apply. Petitioner relies on *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199, for the proposition that for him to be bound by the new rule of law enunciated in *Kungys* would be unjust. But *Allen* was a criminal case in which a new constitutional rule was announced; the instant case is a civil proceeding in which a statutory interpretation was merely clarified. Where the Supreme Court has applied a rule of law to litigants in one case, we are bound to apply the same rule to all others in the civil context unless specific procedural rules or res judicata prevents it. *James B. Beam Distilling Co. v. Georgia*, — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481. Moreover, even if *Kungys* did not apply to Kalejs, his misrepresentations would still be material under *Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 151, 5 L.Ed.2d 120, since "facts were suppressed which, if known, would have warranted denial of citizenship or * * * [whose] disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship."

When Kalejs applied to enter the United States, consular officials had the authority under 8 U.S.C. § 1182(a)(27) to exclude those who "seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." This statute conferred great discretion on consular officials and, according to testimony at Kalejs' hearing, it was frequently employed in the late 1950s to exclude those suspected of Nazi involvement. Two former consular officials told the immigration judge that State Department policy in 1958 when Kalejs applied for a visa was to explore in great depth the wartime activities of German collaborators, and anyone with serious involvement in Nazi activity would have had their applications

denied. If Kalejs had told the truth about any part of his war service in the Arajs Kommando, it would certainly have prompted further inquiry—in this sense the lies undoubtedly tended to influence the decision of American officials to permit Kalejs to enter the country, the test under *Kungys*—and would probably have tipped the scales entirely against admitting him. This establishes a rebuttable presumption that Kalejs would not have been admitted to this country had he told the truth, and Kalejs has done nothing to refute this notion. We hold, therefore, that Kalejs' lies on immigration documents were material and resulted in his obtaining a visa and admission to the United States. He is thus deportable for lying on his immigration forms, although as noted the BIA was also justified in deciding to deport Kalejs for persecuting innocents.

■ Petitioner finally argues that we should scrap most of the evidence against him because it is inherently unreliable. A number of witnesses were deposed in Riga in September 1987 in what was then part of the Soviet Union, and many Nazi-era documents were stored in Soviet-controlled archives. Moscow recognized Latvia's independence in September 1991 before the Soviet Union itself dissolved, but those events do not alter this case. According to Kalejs, prosecutors erred in considering evidence from the Soviet Union and then compounded their error by failing to allow the accused to engage in sufficient discovery so that he could prove the Soviet treachery. At its heart, this is a claim about the denial of due process. First, we reject out of hand the overarching argument that any evidence flowing from the Soviets is fundamentally flawed because, as the petitioner's brief points out, "Lenin as a founder of his country was no George Washington" (Brief at 35). It is true that Lenin might not have fessed up to chopping down cherry trees, and we do not discount the possibility that the Soviets may have manufactured evidence in some cases involving Nazi collaboration to excuse their own conduct in the war. But we have relied on evidence from the Soviet Union before, see *e.g., Kairys,* 782 F.2d 1374, and Kalejs has not pointed to any reason why the Soviets would want to implicate him personally, or

demonstrated any unusual interest in his case by Soviet authorities. Where, as here, the Soviet evidence is corroborated by Western documentation, plus reliable eyewitness testimony subject to vigorous cross-examination, and the evidence is credible on its own terms, we will not discard a case against a Nazi collaborator merely because some of the evidence originated in the Soviet Union.

■ More specifically, Kalejs complains that (1) he could not interview witnesses before their depositions were taken in the Soviet Union; (2) witnesses' previous statements were withheld; (3) the witnesses should have been deposed in the United States rather than the Soviet Union; (4) Kalejs could not attend the depositions; (5) witnesses were intimidated by the Soviet prosecutors; and (6) neither Kalejs' attorney nor United States officials could rent cars and visit the sites of the atrocities or examine Soviet archives. We can easily dismiss most of these claims because there is no general right to discovery in a deportation hearing so long as the accused had reasonable opportunity for cross-examination, as there was here. *Kulle v. Immigration and Naturalization Service,* 825 F.2d 1188, 1194 (7th Cir.1987), certiorari denied, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860. The Federal Rules of Civil Procedure simply do not apply; thus most of the cases cited by Kalejs are irrelevant. In one instance in his brief, Kalejs actually attempts to hold the government to the standards of a criminal proceeding under *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (Brief at 32). Such cases are wholly inapplicable. Clearly, the stakes of deportation hearings are great in terms of reputations and disruptions to lives, and we must ensure that such proceedings do not turn into kangaroo courts. But the hearings in this case were conducted with eminent fairness to Kalejs.

Also, many of Kalejs' due process claims are patently ridiculous. The depositions were taken in the Soviet Union because the witnesses were too old and frail to travel to the United States. Kalejs did not attend because he did not ask to attend, and so waived that issue even if it had merit. The

government actually did turn over to Kalejs' counsel all witness statements it had in its possession; those witnesses for whom the United States did not have previous statements were by and large witnesses called by Kalejs himself to corroborate his case. As noted, there is no general right to discovery in a deportation hearing, but there is certainly no right to discovery of documents that the government does not have in its possession and is unable to obtain. Finally, the accused has not told us and we cannot even begin to imagine what Kalejs would hope to uncover by visiting the sites of atrocities committed fifty years ago. In short, Kalejs received ample due process. We reject this and all other claims made by the petitioner.

For the reasons stated above, the BIA's decision to deport Konrads Kalejs is affirmed.

MANION, Circuit Judge, concurring.

The Board of Immigration Appeals determined that Kalejs should be deported under U.S.C. §§ 1251(a)(1)(A), 1251(a)(1)(B) and 1251(a)(4)(D). I concur. Although I agree with the dissent that "evidence" generated under the watchful eye of the Soviet dictatorship is inherently unreliable and has no place in an American proceeding, I think the untainted evidence supports the Board's decision. Therefore, I agree that the Board's decision to deport Kalejs should be affirmed.

The dissent properly recognizes the reality of the "evil empire," brought into full view recently by the fall of the Iron Curtain.[1] The dissent, however, fails to consider the highly deferential standard by which we review Board deportation decisions. *Sivaainkaran v. I.N.S.*, 972 F.2d 161, 163 (7th Cir. 1992). "[W]e must uphold the Board's determination if it is 'supported by reasonable, substantial, and probative evidence on the record as a whole, ...'" *Id.*; 8 U.S.C. § 1105a(a)(4). The evidence which exists independent of any Soviet taint includes the expert testimony of Dr. Raul Hilberg, set

forth at length throughout the court's opinion, and Kalejs' own testimony concerning the University of Riga documents which confirm his service in the Latvian Security Section, also discussed at length in the court's opinion at 445. The record must be taken as a whole; as a whole, the tainted Soviet depositions and documents merely confirm the untainted evidence. The evidence is, therefore, sufficient to satisfy the deferential substantial evidence test. The Board's decision of deportation is, accordingly, conclusive. § 1105a(a)(4). I, therefore, concur.

EISELE, Senior District Judge, dissenting.

Konrads Kalejs is now 80 years of age. He is a native of Latvia and a naturalized citizen of Australia. He resided in Latvia from 1941–1944 during the German occupation. In 1959 he was admitted to the U.S. as a permanent resident based upon his application to the American Consulate in Australia. He was arrested in Florida on April 19, 1985, as a result of this deportation action which was brought pursuant to § 241(a)(1), 241(a)(2), and 241(a)(19) of the Immigration and Naturalization Act of 1952, as amended. 8 U.S.C. § 1251(a)(1), 1251(a)(2), 1251(a)(19). A final Order of Deportation was entered on April 30, 1992. On May 22, 1992, Kalejs filed a Petition for Review in this Court pursuant to 8 U.S.C. § 1105a(a). Such a Petition for Review is the sole and exclusive procedure for the review of final orders of deportation.

The record on review consists of some twenty volumes containing almost 8,000 pages but there are only two major allegations that we must deal with:

1) Whether Mr. Kalejs participated in, or assisted in, persecution under the Holtzman Amendment, and

2) Whether Mr. Kalejs made any wilful misrepresentation as to a material fact in the application he made in connection with the issuance of his United States visa.

---

**1.** The court is correct that neither Lenin nor his successors Stalin, Khruschev or Brezhnev "fessed up to chopping down cherry trees." Opn. at 447. I would add to this observation that they also never fessed up to imposing a corrupt system on the people they ruled, nor to maintaining that system through intimidation, lies, and the wholesale slaughter of millions of people.

The two issues are interrelated. In his application for a visa in 1959, Mr. Kalejs claimed that he had been a farm laborer during the war. Although he may have worked from time to time on a farm during that period, this cannot be considered a true statement. But we need to know the real truth in order to determine if this falsehood constitutes a misrepresentation of a material fact which would justify his exclusion in 1959. It appears that if he had stated that he had served in Latvian military units fighting with the Germans against the Russians, and if that representation were true, he would not, on that basis alone, have been excluded from entry in 1959. And if that were the truth, then it appears that the false statement (that he was a farm laborer) would not alone have been deemed material so as to preclude his entry into the U.S. at that time.[1]

But the respondent contends and believes that Mr. Kalejs participated in the persecution of Jews and others and was, indeed, a member of a "killing squad" that murdered some 29,000 persons before August 10, 1941. And, more specifically, it is also contended that Mr. Kalejs was involved in the killing of 27,000 people on November 30, 1941, and another 17,000 on December 8, 1941. One can legitimately ask: if the respondent INS had not believed that Kalejs participated in, or assisted in, such persecution, would it nevertheless have maintained that he should be deported because of a wilful misrepresentation of material fact on his application for a visa? So the two issues cannot be clinically separated in my opinion. If the allegations that Mr. Kalejs participated and assisted in persecution cannot be sustained on this record then the basis for determining whether the visa application misrepresentation was material will also be undercut.

1. The "materiality" analysis explained in *Petkiewytsch v. INS*, 945 F.2d 871, 881 (6th Cir.1991) is helpful:

We agree with the *Maikovskis* [*v. Immigration & Naturalization Service*, 773 F.2d 435] court that when an alien has made misrepresentations, "the materiality of the misrepresentations is established where the government shows that disclosure of the concealed information probably would have led to the discovery of facts warranting the denial of a visa."

The Amended Order to show cause contained 25 allegations. The first 6 were not seriously contested. The remaining allegations (7–25) relate to three major substantive issues, one of which has several sub-parts.

The first issue was whether Mr. Kalejs' membership or activities in an unnamed Latvian self-defense unit at Litene in mid-July, 1941, shortly after the invasion of Latvia by Germany, constituted participation in persecution. The Immigration Judge thought not and the BIA made no finding.

The next issue was whether Mr. Kalejs was a member of the Arajs Kommando and, if so, whether his activities in that unit constituted participation in persecution. This issue had four sub-parts:

1) Concerning activities from July, 1941, until December, 1941. The IJL stated that "... the evidence reflects that the respondent signed his name to the rolls of the Arajs Kommando in July [1941] ... There is no evidence of participation or assistance beyond this act ... I find the government has failed to sustain its heavy burden of proof ..." The BIA reversed.

2) Concerning the period from January, 1942, to November, 1942. The Immigration Judge found "... respondent was a member of Arajs Kommando ... on the eastern front from January through fall of 1941, ... and that respondent assisted and participated in this persecution." The BIA reversed.

3) For the year 1943. The Immigration Judge ruled "... respondent was the Company Commander of a guard unit at a camp for Latvian Jews in Porkof, and that members of his company participated in the execution of 20–39 gypsies in Porkof ... respondent assisted in persecution ... in Porkof in 1943." The BIA affirmed.[2]

773 F.2d at 442. In view of our conclusion that Petkiewytsch's service for eight months as a guard at Kiel–Hasse did not subject him to deportation, we do not believe his failure to disclose that conduct related to a "material fact."

2. The IJ and BIA agreed that in 1943 Kalejs acted as a company commander in the Arajs Kommando of a guard unit at Porkov concentration camp which guarded some 20–39 gypsies before, but not at the time, the Nazis shot them. The sole evidence for this finding came from the deposition of one Soviet witness.

4) Dealing with Mr. Kalejs' alleged role as a Company Commander of the external guard unit at Salaspils and Sauriesi concentration camps. The Immigration Judge found "... respondent was a Company Commander under the Arajs Kommando and German SD of the armed exterior guard unit at Salaspils and Sauriesi ... Respondents' positions and activities at [these camps] constituted assistance and participation in persecution...." The BIA affirmed.

The third major issue is whether Mr. Kalejs misrepresented to the American Consulate his membership and activities in connection with the Arajs Kommando and, if so, whether such misrepresentation was material. The Immigration Judge found that "...respondent's failure to reveal his wartime activities when applying for his U.S. visa was a willful and material misrepresentation." The BIA affirmed.

The lack of congruity between the findings of the IJ and the BIA on the various issues is striking. They disagreed on all but the following: The BIA affirmed the IJ's ruling that Kalejs was the company commander of a guard unit for Latvian Jews at Porkov and "that members of his company participated in the execution of 20–39 gypsies in Porkov." And the BIA affirmed the IJ's finding that Kalejs was the company commander of the exterior guard unit at Salaspils and Sauriesi concentration camps and that his "positions and activities" at [those camps] constituted assistance and participation in persecution. Finally, the BIA affirmed the IJ's finding that Kalejs' failure to reveal his wartime activities in his visa application constituted a wilful and material misrepresentation.

It is the contention of the petitioner that the proof of his participation or assistance in persecution did not meet the "clear and convincing" standard of proof. He argues that the video depositions of persons controlled by the Soviet Union which were taken in the Latvian Soviet Socialist Republic should not have been admitted into evidence and, in any event, should be disregarded in any assessment of the factual basis for the charges against him. He argues that the restrictions

placed upon him and his attorneys deprived him of the opportunity to develop his defense or to participate in meaningful cross-examination of the Soviet controlled witnesses. He also contends that the Soviet Union placed the same restrictions upon the U.S. Government as it did upon him, thereby depriving the Government of any realistic opportunity to evaluate the truthfulness of the Soviet controlled witnesses upon whom it relied. He asks: how can our government vouch for the testimony of witnesses it was unable to interrogate? How could it evaluate the witnesses' testimony without having access to their earlier written statements or previous testimony taken years ago and much nearer the events at issue? He argues that the testimony taken in the Soviet Union, under the control of the then Soviet Government and under the restrictions imposed, was inherently unreliable. But the petitioner's contention with respect to the Soviet witnesses is better stated in his own words:

The Soviet Union did not permit the United States to independently, privately interview the Soviet witnesses, nor for that matter to interview Soviet witnesses at all prior to the taking of the video taped depositions. The United States was not permitted to visit the Russian sites of the conduct charged; it was not permitted to independently investigate within the Soviet Union in efforts to find its own witnesses; it was not permitted to visit and search the Soviet archives; it was not permitted to inspect and review the prior written statements of the Soviet witnesses that were refused to the defense. OSI's expert witness, Dr. Hilberg was not permitted to visit any Soviet archives. OSI's attorneys and investigators were not permitted self drive car rentals and their visas were restricted to Riga just as the defense attorney's. OSI's response is parity—that OSI was also denied the same witness statements and investigation in the Soviet Union. But, OSI's failure to investigate and confirm Soviet witness reliability exacerbates rather than ameliorates the deficiencies. The Soviet deposition evidence adduced in this case has not been adequately

investigated by our government. The deposition evidence is unverified. What was produced on the Soviet video tapes is the spoon fed creation of the KGB untested by the defense and untested by OSI. OSI can not vouch for the accuracy of the Soviet offered evidence.

Kalejs' Opening Brief, pp. 33–34.

It will be helpful to review the procedural background to these contentions.

After a change of venue, the case was assigned to Immigration Judge Petrone. The Office of Special Investigation (OSI) moved for permission to take evidentiary depositions in the Latvian Soviet Socialist Republic. Mr. Kalejs asked for copies of all prior witnesses' statements. The OSI agreed to provide such statements that were in its possession in advance of the trip to the Soviet Union. The trouble was that there were many acknowledged prior statements made by the Soviet witnesses which were not in the possession of the OSI and which were not produced by the Soviets. Mr. Kalejs also asked for site visits and the opportunity to go into the Soviet controlled archives where relevant documents are allegedly maintained.[3] Such opportunities were denied to the defense. It obviously would have been to the interest of the defense if Mr. Kalejs could have personally attended the taking of the Soviet depositions. However, due to the terms of his bond and the refusal of the Soviet Government to disclose whether criminal charges would be placed against him in the Soviet Union, he was, as a practical matter, unable to attend with his attorneys. It does not seem unreasonable that he would be greatly concerned that the Soviets would detain and charge him if he attended the depositions. After all he had deserted from the Red Army and had admittedly fought with Latvian units in support of the Germans against the Soviets. So I have difficulty with the majority's assertion that "... Kalejs has not pointed to any reason why the Soviets would want to implicate him personally or demonstrated any unusual interest in his case by Soviet authorities." If history is to play a major role in the government's case against Mr. Kalejs, as appears to be the situation, then one would want not only the history of the German Nazi's plans and actions and those of their evil collaborators, but also the plans and actions of the Soviets during the events at issue and subsequent thereto during prosecutions of those alleged by the Soviets to be responsible. For history is revealing more and more as time goes by that the evil deeds of the Soviet Union in this area of the world were second only to those of the Nazi regime. But I will have more to say later about the "expert" evidence relied upon by the government in this case.

Basically my problems with these proceedings arise out of my belief in the importance and efficacy of process in reliably resolving factual issues, that is, in establishing the truth. And without first establishing the truth, we can have no confidence in the justness of the outcome.

If I believed that there exists in this record a reliable evidentiary basis for the following "facts", as quoted from the majority opinion, that is, that such "facts" had been reliably established, using appropriate due process standards, I would of course concur in that opinion:

> Konrads Kalejs was born on June 26, 1913, in Riga, Latvia. He was educated as a professional soldier and served as a lieutenant and first lieutenant in the Latvian military. In 1940, the Russians overran Latvia. Kalejs salvaged his military career by joining the conquering Red Army, but a year later the Russians were themselves pushed out of Latvia by the Nazis, whose forces were driving relentlessly toward Russia on the eastern front. Again Kalejs sided with the victors; he deserted his Red Army comrades and, according to the evidence presented here, joined a pro-German force called the Latvian Auxiliary Security Police. The unit was allegedly known as the Arajs Kommando after its leader Viktors Arajs, who was convicted by a German court and sentenced to life imprisonment in 1979 for committing wartime

---

3. It appears that the expert relied upon so heavily by the government, Dr. Hilberg, did have access to some of this archival information but only that which was supplied by the Soviet government. He was not permitted to visit the archives.

atrocities. (Arajs died in prison.) According to the Justice Department, from July 1941 until at least June or July of 1944, Kalejs was a company commander and first lieutenant in the Arajs Kommando.

The Nazis' policy in Latvia (as elsewhere) was to murder all Jews, Gypsies and many Communists. After the German Army swept through an area, a mobile killing crew would follow shortly, hoping to catch victims unaware. These mobile killing units were called the Einsatzgruppe or, in Latvia, the Einsatzkommando. According to the government's expert witness in the case against Kalejs, Dr. Raul Hilberg, a renowned Holocaust scholar and professor of political science at the University of Vermont, the Einsatzkommando assigned to Latvia had just 170 members. The logistics of attempting the systematic annihilation of the 70,000 Jews in Latvia prompted the Einsatzkommando to rely on bands of local soldiers. The Arajs Kommando was such a group. As a company commander, Kalejs was one of six or seven officers who were second in command to Arajs; he had a hundred men or more under his direction.

Dr. Hilberg testified that according to German documents, the Einsatzkommando with the help of the Arajs Kommando and similar local groups managed to murder 29,000 people (90 percent of them Jewish) before August 10, 1941. A few months later, in order to make room in Riga's Jewish ghetto for the thousands of Jews whom Hitler had shipped out of Germany, 27,800 Jews were shot in the woods near Riga in the space of three days. By January 1942, only 4,000 of the 70,000 Jews who were in Latvia at the beginning of the war were still alive. The Arajs Kommando working with the Einsatzkommando was responsible for more than half of these killings.

Kalejs and his unit had two other duties besides killing Jews in the Riga ghetto. Outside of Latvia (usually in Russia) the Arajs Kommando joined the German SS in so-called anti-partisan activity, which was little more than a cover for arresting and murdering civilians. In addition, the Arajs Kommando under the leadership of Kalejs served as guards at the Salaspils concentration camp. The conditions there were brutal, although Salaspils was a labor camp whose inmates died primarily from inhumane conditions or being shot while trying to escape, rather than a killing camp such as Auschwitz where the prisoners were systematically murdered in gas chambers. The Arajs Kommando was charged with guarding work details and preventing escapes at Salaspils.

The horror of the Holocaust and certain accepted historical facts can create a cloud, or an inertial wave, that can engulf the innocent as well as the guilty.[4] And the circumstance that there is no statute of limitations in cases of this type—and most would agree, properly so—should not make us close our eyes to some of the problems with which such limitation rules are intended to deal: staleness, loss of memory, the death of witnesses and the disappearance of documentary and other evidence. Frustrations arising out of the difficulties experienced in bringing evil persons to justice some 50 years after their crimes may dull concerns for the due process requirements of our law. And when the vehicle for the inquiry into a person's alleged participation in persecution during the early 1940s is a statute, such as the Holtzman Amendment, one must guard against the tendency to expand that "net" beyond the ordinary and natural meaning of the language employed.

So just as I am concerned about the reliability of the factual findings stated by the majority, I am also not confident that the majority has correctly defined the reach of the Holtzman Amendment and particularly the phrase "assisted or otherwise participate in the persecution of any person because of race, religion, national origin or political opinion." The majority states:

Assigning personal responsibility in a military regime is complex, particularly

4. This is certainly not to suggest that Mr. Kalejs is innocent, or, for that matter, guilty. It is to emphasize the need for cautious objectivity which, although always important, is doubly so in these emotional circumstances.

with regard to Holocaust era crimes because the Nazi's murderous proficiency insured there would be few witnesses. In only a handful of these cases are there people who can place the accused at the scene of a specific crime with a gun in his hand. The same is true here. The Holtzman Amendment's non-criminal provision thus makes *assistance* in persecution an independent basis for deportation, and assistance may be inferred from the general nature of the person's role in the war; therefore, the atrocities committed by a unit may be attributed to the individual based on his membership and seeming participation.

"Assistance" can only take us so far. It is equivalent to "aid and abet." Both to "participate in persecution" and to "assist in persecution" should require acts and conduct coupled with the pertinent culpable state of mind. It is doubtful that a deportation statute could be written, constitutionally, to omit either of these requirements. In any event, the Holtzman Amendment, in my opinion, requires both. But, of course, these requirements may be established by circumstantial, as well as direct, evidence. Even so, I do not believe that "atrocities committed by a unit may be attributed to the individual based [solely] on his membership and seeming participation."

I agree with the majority's citation of the language in *Kairys v. INS*, 981 F.2d 937, 943 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993), analogizing the provisions of the Holtzman Amendment to the requirements of an "ordinary criminal conspiracy." And we know that co-conspirators must have knowledge of the illegal purposes of the conspiracy and act in some way, however minor, to help the conspiracy succeed.

So I disagree with Mr. Stephen Massey's conclusion in his article "Individual Responsibility for Assisting the Nazis in Persecuting Civilians," 71 Minn.Law Review 97, 169 (1986), cited by the majority, in which he argues that persons assist in persecution if they personally participated in persecution or "knowingly and more than minimally contributed to a group that persecuted civilians."

Mr. Massey does not agree with *Laipenieks v. INS*, 750 F.2d 1427 (9th Cir.1985) requiring "personal active assistance or participation."

One of the more complete discussions of the issue will be found in *Petkiewytsch v. INS*, 945 F.2d 871, 876–881 (6th Cir.1991) where some very different "line drawing" by the Seventh Circuit and the other Circuits is described:

The "line drawing" in cases under the Holtzman Amendment has been particularly difficult and has produced conflicting results. In *Schellong v. INS*, 805 F.2d 655 (7th Cir.1986), *cert. denied*, 481 U.S. 1004 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987), the court of appeals applied the Holtzman Amendment to affirm the deportation of a person who voluntarily joined a special commando unit of the Nazi SS and served as an armed guard at two concentration camps. *Id.* at 656–57. There was no evidence, however, that Schellong personally engaged in physical abuse of prisoners while serving as a guard. *Id.* at 657. The court noted that it had previously held in *United States v. Kairys*, 782 F.2d 1374 (7th Cir.) *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986), that service as a guard at a concentration camp equaled persecution under the DPA [Displaced Persons Act] without proof of personal involvement in atrocities. *Id.* at 660. Concluding that the purposes of the two statutes were identical, the court found that proof of Shellong's service as a guard at a concentration camp established that he had "assisted in persecution for purposes of Section 1251(a)(19)" and therefore was deportable. *Id.* at 661. The court specifically rejected the argument that an individual must have actively or personally participated in persecution to be deportable under the Holtzman Amendment as inconsistent with *Fedorenko*. *Id.* This holding was reaffirmed in *Kulle v. INS*, 825 F.2d 1188 (7th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988).

Another court reached a different conclusion in *Laipenieks v. INS*, 750 F.2d 1427 (9th Cir.1985), a deportation proceeding

under the Holtzman Amendment against a native of Latvia. The petitioner had served voluntarily as a member of the Latvian Political Police, an organization formed to investigate and arrest individuals who participated in Soviet atrocities against Latvian citizens during the period of Soviet domination which preceded Nazi occupation, *Id.* at 1429. Although Laipenieks admitted slapping Soviet sympathizers taken as prisoners, the court of appeals found that the INS failed to establish by clear and convincing evidence that Laipenieks' individual conduct had been motivated by the political opinion of the prisoners. Relying on the legislative history of the Holtzman Amendment, the court held that deportability under § 1251(a)(19) "may only be sustained when the evidence establishes that the individual in question *personally* ordered, incited, assisted, or otherwise participated in the persecution of individuals." *Id.* at 1431 (emphasis added). Relying on note 34 in *Fedorenko* and the legislative history of the Holtzman Amendment, the court concluded that the proper analysis under the Holtzman Amendment was whether there was "proof of *personal active assistance* or participation in persecutorial acts ..." *Id.* at 1432 (emphasis added).

The opinion then goes on to explain the background of the Holtzman Amendment and its important legislative history:

Although the Holtzman Amendment was designed to fill a loophole in the permanent immigration law and its language is similar to that found in the DPA, the legislative history indicates an intention, at least in part, to accomplish a different purpose. The DPA was designed to provide relief to the multitude of displaced persons and refugees in Europe after the end of World War II. The problem was one of immense proportions and there was need for immediate action. These factors doubtless account for the absence of any legislative history addressing the provision in the 1948 DPA excluding persons who had assisted in persecution and for the decision merely to incorporate portions of the IRO constitution. Thirty years later, when the Holtzman Amendment was adopted, it had

become clear that some war criminals, actual perpetrators of the Holocaust and other war crimes, had entered this country under the 1952 Act. The Holtzman Amendment provided the basis for their deportation.

The Holtzman Amendment's legislative history contains a clear and repetitive message that the amendment was intended to deny "sanctuary in the United States to Nazi *war criminals*" 124 Cong.Rec. 31,647 (1978) (statement of Rep. Holtzman) (emphasis added), and that the "bill applies to any person who committed *war crimes* under the Nazis ..." *id.* at 31,649 (emphasis added). The specific discussion on the House floor in which Representative Holtzman explained the purpose and scope of the bill demonstrates that the focus of the bill's intent centers on Nazi war criminals. Indeed, reference to "Nazi war criminals" or "war criminals" is made no less than nineteen times during the short discussion in which the purpose and reach of the bill is explained. See 134 Cong.Rec. 31,646–50 (1978). At one point Representative Holtzman explained the bill as follows: "The bill as reported here contains an amendment that limits the language of the bill *solely to those persons who engaged in war crimes ...*" 134 Cong.Rec. 31,647 (1978) (emphasis added). Again she stated, "[T]he bill is intended to cover *active participation* and not mere acquiescence by the population as a whole." *Id.* at 31,649 (emphasis added). Representative Holtzman was joined in explaining the bill by another subcommittee member, Representative Eilberg, who stated the bill's purpose:

Mr. EILBERG. [T]he purpose of this bill, which is cosponsored by all of the members of the Subcommittee on Immigration Citizenship and International Law, is to prevent the entry into, as well as facilitate the deportation from the United States of *aliens who have engaged in persecution* based on race, religion, national origin or political opinion under the Nazis.

*Id.* at 31,647 (emphasis added). Mr. Eilberg and Ms. Holtzman each went on to

make several additional references regarding the bill's applications to those who *engaged* in war atrocities. *Id.* at 31,647–48. Representative Eilberg also stated:

> [T]hat dreadful period in the history of mankind should forever serve as a tragic reminder to all civilized people of the terrible extremes to which an entire nation can be led by a small but highly organized group of demented and *ruthless leaders.* This bill addresses itself to the *members of that group-to the perpetrators* of the "Holocaust."

*Id.* at 31,647 (emphasis added).

We appreciate the fact that statements in floor debate often do not truly reflect the purpose of an act of Congress. Nevertheless, this bill was the work of Representative Elizabeth Holtzman, and her statement of its purpose is entitled to careful consideration, particularly in view of the similar statements found in the committee report. Representative Eilberg's statements concerning the intent of the subcommittee which first approved the Holtzman Amendment is equally persuasive.

The Holtzman Amendment's purpose of reaching war criminals is further clarified by statements in the legislative history indicating the degree of participation in persecution necessary to come within the Holtzman Amendment. The statement of the Holtzman Amendment's purpose reads:

### Purpose of the Bill

> The purpose of the bill is to exclude from admission to the United States *aliens who have persecuted* any person on the basis of race, religion, national origin, or political opinion and facilitate the deportation of such aliens who have been admitted into the United States.

H.R.Rep. No. 95–1452, 95th Cong.2d Sess. at 1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4700. This language appears to require active participation in persecution going beyond "assistance." In discussing the Holtzman Amendment's application, the House Report goes on to state that "it is important to stress that the conduct envisioned must be of a deliberate and severe nature and such that is condemned by civilized governments, . ." *Id.* at 7, 1978 U.S. Code Cong. & Admin.News at 4706.

Finally the Court integrates the legislative history of the Holtzman Amendment with the *Fedorenko* case:

> If, as the Supreme Court states, the focus under the DPA should be on the "particular conduct" of the immigrant, then given the legislative history of the Holtzman Amendment, the focus should be even more searching under § 1251(a)(19). Although Petkiewytsch wore a uniform and carried a rifle, the Board found that he was at all times a reluctant civilian guard, once himself imprisoned for failing to perform his guard duties diligently. The camp where he served was the least punitive of all types of Nazi camps. The Board also found that the petitioner served under duress and that he was told he would be shot if he attempted to escape. He never personally engaged in acts of persecution, and was released by the British authorities, who interned him as a suspected war criminal, upon a finding that the charges could not be sustained. His "particular conduct" just does not fit the description of a "Nazi war criminal" or a "person[ ] who engaged in war crimes," repeatedly described as the class sought to be made deportable by the Holtzman Amendment.

> Given all the circumstances disclosed by this record we do not believe that *Fedorenko* requires a finding that Petkiewytsch is subject to deportation under § 1251(a)(19). Deporting this petitioner would not further the goal of the Holtzman Amendment and would carry out no discernable policy of the United States.

This discussion of the Holtzman Amendment and the proper "line drawing" thereunder becomes important only if it is determined that much of the evidence relied upon by the government to prove that Mr. Kalejs was a member of the Arajs Kommando and participated in persecution must be stricken and ignored. For if all of the government's evidence is accepted, including the Soviet depositions, then the deportation order would have to be affirmed.

As pointed out by the majority, Mr. Kalejs' basic attack is predicated on due process grounds. I quote the pertinent portions of the majority opinion:

> Kalejs presses upon us essentially three arguments: ... that prosecutors relied on inherently untrustworthy evidence—depositions and documents salvaged from the archives of the former Soviet Union—and then compounded the error by denying him due process.

> \*    \*    \*    \*    \*    \*

> Petitioner finally argues that we should scrap most of the evidence against him because it is inherently unreliable. A number of witnesses were deposed in Riga, Latvia in September 1987 in what was then part of the Soviet Union, and many Nazi-era documents were stored in Soviet-controlled archives. Moscow recognized Latvia's independence in September 1991 before the Soviet Union itself dissolved, but those events do not alter this case. According to Kalejs, prosecutors erred in considering evidence from the Soviet Union and then compounded their error by failing to allow the accused to engage in sufficient discovery so that he could prove the Soviet Treachery. At its heart, this is a claim about the denial of due process.

> \*    \*    \*    \*    \*    \*

> More specifically, Kalejs complains that (1) he could not interview witnesses before their depositions were taken in the Soviet Union; (2) witnesses' previous statements were withheld; (3) the witnesses should have been deposed in the United States rather than the Soviet Union; (4) Kalejs could not attend the depositions; (5) witnesses were intimidated by the Soviet prosecutors; and (6) neither Kalejs' attorney nor United States officials could rent cars and visit the sites of the atrocities or examine Soviet archives.

The majority disposes of the due process issue as follows:

> We can easily dismiss most of these claims because there is no general right to discovery in a deportation hearing so long as the accused had reasonable opportunity for cross-examination, as there was here.

*Kulle v. Immigration and Naturalization Service*, 825 F.2d 1188, 1194 (7th Cir.1987), certiorari denied, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860. The Federal Rules of Civil Procedure simply do not apply, thus most of the cases cited by Kalejs are irrelevant. In one instance in his brief, Kalejs actually attempts to hold the government to the standards of a criminal proceeding under *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (brief at 32). Such cases are wholly inapplicable. Clearly, the stakes of deportation hearings are great in terms of reputations and disruptions to lives, and we must ensure that such proceedings do not turn into kangaroo courts. But the hearings in this case were conducted with eminent fairness to Kalejs.

> Also, many of Kalejs' due process claims are patently ridiculous. The depositions were taken in the Soviet Union because the witnesses were too old and frail to travel to the United States. Kalejs did not attend because he did not ask to attend, and so waived that issue even if it had merit. The government actually did turn over to Kalejs' counsel all witness statements it had in its possession; those witnesses for whom the United States did not have previous statements were by and large witnesses called by Kalejs himself to corroborate his case. As noted, there is no general right to discovery in a deportation hearing but there is certainly no right to discovery of documents that the government does not have in its possession and is unable to obtain. Finally the accused has not told us and we cannot even begin to imagine what Kalejs would hope to uncover by visiting the sites of atrocities committed fifty years ago. In short, Kalejs received ample due process.

Short of constitutional requirements, just what are the due process rights of aliens in deportation cases? The statute and regulations which identify certain of the rights of respondents in such civil proceedings are set forth as follows:

Section 1105a of Title 8 provides in part: The procedure prescribed by, and all the provisions of chapter 158 of Title 28 shall

apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title or comparable provisions and of any prior Act ..

Section 1252(b) of Title 8 provides in part:

\*       \*       \*       \*       \*       \*

Proceedings before a special inquiry officer acting under the provisions of this section shall be in accordance with such regulations, not inconsistent with this chapter, as the Attorney General shall prescribe. Such regulations shall include requirements that are consistent with section 1252b of this title and that provide that—

\*       \*       \*       \*       \*       \*

(3) the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government, and

(4) no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

8 C.F.R. § 242.16 (1988) provides in part:
Hearing.

(a) *Opening.* The Immigration Judge shall.... advise the respondent that he will have a reasonable opportunity to examine and object to the evidence against him, to present evidence in his own behalf and to cross-examine witnesses presented by the Government;

The government relied principally on its expert witness, Dr. Hilberg, and Soviet supplied documents and witnesses to establish Mr. Kalejs' membership in the Arajs Kommando and his assistance in persecution.

First, I have much difficulty with the majority's willingness to accept and rely upon the opinion testimony of the government's expert witness, Dr. Raul Hilberg, to establish critical ultimate facts, not just general historical background, in deportation prosecutions such as this. The stakes are too high, the consequence of error too great, to rely upon such compound hearsay. Dr. Hilberg is un-

doubtedly a renowned Holocaust scholar and historian. But are we really dealing with expert opinion here? Is it appropriate to use expert opinion to establish any and all historical facts? All facts may be considered "historical" whether they relate to events occurring minutes ago, or 50 years ago, or 1000 years ago.

Dr. Hilberg concluded that Mr. Kalejs was a member of the Arajs Kommando. He based his opinion on certificates to the University of Riga, which were produced at the trial, on other documents that were *not* produced at the trial, and upon the statement of one Arthur Abols, who died in the early 1960's, that Kalejs was a company commander at Salaspils in the spring of 1943. Petitioner questions the existence of the Abols statement (which was not offered in evidence). He further notes that there is no explanation for its absence.

The government does not take exception to the following comments of petitioner's attorney on Dr. Hilberg's testimony:

Hilberg identified and testified from a chart prepared by OSI, Exhibit 19 (v.9, 3197). The chart purports to be a table of organization from Hitler to the Arajs Kommando. The bottom line of the chart purports to name company commanders of the Arajs Kommando (v.3, 842)—Cukurs, Kalejs, Kalnins, Laukers, Ozols, Svikeris (v.9, 3197).... Hilberg obtained all the names, except Kalejs' from the decision in the case of *People vs. Arajs,* District Court of Hamburg, 1980, Exhibit 22T, (v.11, 3634).

The Soviet documents in evidence upon which Hilberg may rely relating to Kalejs during the war were represented to come from the Central State Historical Archive of the Soviets in Latvia (v.12, Exhibits 23, 25, 37A, 44, 45, 46). The defense was denied entry into those Archives.... Hilberg did not feel these documents compelling, however, he stated he had seen other more compelling documents connecting Kalejs to Arajs Kommando. These documents, if they existed at all, were not offered into evidence.

Dr. Hilberg's list of the company commanders of the Arajs Kommando, with the

exception of Mr. Kalejs, came from the decision in the case of *People v. Arajs* in District Court of Hamburg, Germany in 1980. As mentioned, that 157 page opinion names· all of the Arajs officers except Mr. Kalejs. And Mr. Arajs' German attorney, Mr. Burger, confirmed that Mr. Kalejs's name was not mentioned in the testimony or the exhibits in the Arajs trial nor, apparently, was the name of Mr. Kalejs mentioned in the various books written about the Arajs Kommando. And there appear to be no German records which name Mr. Kalejs as a member of that organization.

Again, it appears that Dr. Hilberg's opinion was based principally on absent documents and the Abols statement.[5] The University of Riga documents, which were produced, were compromised in his opinion:

"The problem I have encountered with materials that come from the Soviet Union is ... I do not see the entire folder from which the document is taken. What I am missing is a context, a before and after, which would make it possible for me to better understand the contents of the document."

Mr. Kalejs could very well have been a member of the Arajs Kommando, but the evidence in this case, excluding the Soviet depositions, is inadequate in my opinion to establish that fact. So how should we evaluate the Soviet depositions?

The majority opinion gives short treatment to Mr. Kalejs' arguments about the unreliability of the Soviet witnesses and documents. It states:

But we have relied on evidence from the Soviet Union before, see, e.g., *Kairys*, 783 [782] F.2d 1374, and Kalejs has not pointed to any reason why the Soviets would want to implicate him personally, or demonstrated any unusual interest in his case by Soviet authorities. Where, as here, the Soviet evidence is corroborated by Western documentation, plus reliable eyewitness testimony subject to vigorous cross-examination, and the evidence is credible on its own terms, we will not discard a case

against a Nazi collaborator merely because some of the evidence originated in the Soviet Union.

First, this Court has been cautious and very selective in relying upon evidence from the Soviet Union in these immigration law cases. There appear to be eleven cases involving OSI's use of Soviet depositions. These cases are:

*Matter of Laipenieks*, A11 937 435 (Immigration Court, San Diego 1982). *Matter of Maikovskis*, A8 194 566 (Immigration Court, New York, 1983). *United States v. Sprogis*, No. CV–82–1804 (E.D.N.Y.1984). *United States v. Koziy*, 540 F.Supp. 25 (S.D.Fla.1982). *United States v. Palciauskas*, 559 F.Supp. 1294 (M.D.Fla.1983). *United States v. Hutyrczyk*, 803 F.Supp. 1001 (D.N.J.1992). *United States v. Linnas*, 527 F.Supp. 426 (E.D.N.Y.1981), *aff'd without opinion*, 685 F.2d 427 (2d Cir. 1982). *United States v. Osidach*, 513 F.Supp. 51 (E.D.Pa.1981). *United States v. Kairys*, 600 F.Supp. 1254 (N.D.Ill.1984), *aff'd*, 782 F.2d 1374 (7th Cir.1986). *United States v. Kowalchuk*, 571 F.Supp. 72 (E.D.Pa.1983), 773 F.2d 488 (3rd Cir. 1985). *United States v. Kungys*, 571 F.Supp. 1104 (N.D.N.J.1983), 793 F.2d 516 (3d Cir.1986).

I find myself in agreement with petitioner's analysis of these cases:

Respondent reviews eleven United States cases involving use of OSI's Soviet deposition evidence in its Brief. OSI admits that the depositions were neither credited as principal inculpatory evidence nor as corroborative of other inculpatory evidence in three of those cases (R. Br., P 8). None of the other eight cases used the Soviet depositions as the principal inculpatory evidence where there was a finding against the citizen or immigrant. OSI has not taken issue with the assertion in Kalejs' Brief that:

"The previous Seventh Circuit cases decided favorably to OSI regarding 'participation in persecution' each had the required, official German military assign-

---

**5.** Indeed, Dr. Hillberg relied solely on the Abols statement to establish Mr. Kalejs' service at the Salaspils–Sauriesi concentration camps. This was hearsay on hearsay without the production of the Abols statement or evidence supporting its reliability.

ments that formed the basis of the persecution counts, with photographs of those defendants attached—most displayed defendants' fingerprints." Kalejs' Brief, p. 44.

No such documents were offered against Kalejs. In the eight cases OSI cites in its support, where Soviet evidence was credited at least in part, witnesses from sources other than the Soviet Union claimed personal knowledge and identified the defendants (*Koziy, Palciauskas, Osidach, Kowalchuk*); or defendants had admitted membership (*Linnas, Palciauskas*); or the documentary evidence was "conclusive" (*Kairys*) or depositions were limited to show killings occurred (*Kungys*); or in the most recent case the depositions were taken in the United States (*Hutyrczyk*). Objection by the defense was not made in (*Koziy, Hutyrczyk*); or the defendant did not participate in the Soviet depositions and objection was waived (*Koziy, Palciauskas, Linnas*); or held to be at most harmless (*Palciauskas*). Here the sole identification witnesses who claim personal knowledge of Kalejs were Soviet citizens and their depositions were taken inside of and under the control of the Soviet Union. No German or Latvian military identification records were introduced relevant to alleged Arajs Kommando membership—no photo or thumbprint. Kalejs has consistently denied any service with the Arajs Kommando.

Second, the Soviet authorities had a very good reason to implicate him personally: they considered him a traitor for fighting with the Germans. And their current animus was reflected in the testimony of various Soviet witnesses that they had recently seen articles in the local Communist press about Kalejs.

Third, I am unaware how the Soviet evidence was "corroborated by Western documentation plus reliable eyewitness testimony subject to vigorous cross-examination."

Fourth, the majority's statement that it will not discard a case against a Nazi collaborator merely because some of the evidence originated in the Soviet Union assumes the petitioner's guilt when that is precisely what is in issue.

And the statement by the majority that credits the Soviet's explanation that the reason the Soviet witnesses did not travel to the United States to testify in these proceedings, that is, because they were "too old and frail" to travel, reflects an uncritically narrow focus that borders on the naive.[6] And its statement that Kalejs did not attend the taking of the Soviet depositions "because he did not ask to attend" does not adequately reflect the record on this issue and dismisses the importance of confrontation too casually.

Finally, the majority states that the accused "has not told us and we cannot even begin to imagine what Kalejs would hope to uncover by visiting the sites of atrocities committed fifty years ago." The potentials of visiting the site, interviewing local survivors, reviewing old newspaper morgues, and just snooping around, are well known and understood by good lawyers and investigators.

---

6. The Soviet witnesses here, without exception, served long prison terms in Soviet prisons. Their testimony by deposition was taken in the presence of the Senior Assistant Procurator of Latvian S.S.R., two of his assistants, two prosecutors of the U.S.S.R. General Procurator's Office in addition to two OSI attorneys, the defense attorney, the court reporter, the video tape operator and a translator. The Senior Assistant Procurator of Latvian S.S.R., one Mr. Batarage, presided. So each witness was facing the Soviet Prosecutors from the offices that had sent him to prison. The defense attorney states that no witness who is a citizen of the U.S.S.R. has ever testified in the United States in an OSI case. In *People v. Arajs,* District Court of Hamburg (1980) the Court observed:

"It is known to the Court that witnesses in the Soviet Union generally do not receive exit visas. This, however, is not openly discussed by the Soviets, but generally bears the remark that the witness can not travel due to poor health. When Mrs. Medalje did not respond to the summons to Hamburg, but did appear for the interrogation in Riga, it became clear that the medical reasons had only been contrived. This also applies for the witnesses Lutrinsch and Kalninsch who, though ready to travel, did not appear in Hamburg."

The Soviet witness in this case, Mr. Kalnins, is the same person as the Mr. Kalninsch in the *Arajs* case.

Here we are dealing with a deportation proceeding. The statutes and regulation quoted above mandate that the alien "have a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf and to cross-examine witnesses presented by the Government." Did Mr. Kalejs have such "reasonable opportunity" here? One could, by interpreting the language quoted from the regulation expansively, argue that it simply incorporates *Brady v. Maryland*, *Washington v. Texas*, and the evidentiary rules governing cross-examination. But even if one interprets the language narrowly and concludes that Mr. Kalejs had a reasonable opportunity to examine the evidence that the government *actually chose to use against him*, it can be questioned whether he had a "reasonable opportunity to present evidence on his own behalf," considering the restrictions placed on him in relation to discovery. And, in no event can it be said that he had a "reasonable opportunity to cross-examine witnesses presented by the government," considering the same limitations on discovery (including denial of pre-deposition access to the witnesses and to their prior statements) and the locus and circumstances of the taking of the depositions, including the role of the Soviet procurator in restricting cross-examination. If the regulation does not require this conclusion, surely the Constitution does.

It is not enough for the government to argue that it did the best it could under adverse circumstances over which it had no control. The government did have control over the prosecution of the deportation proceeding. It had to decide whether to rely on and vouch for witnesses and evidence it had no opportunity to adequately investigate. It could even, as a last resort, choose to forego proceeding against one it felt probably guilty of serious war crimes rather than risk reliance on untestable evidence and witnesses, all compromised by Soviet control.

The language of Chief Judge Aldisert in his dissent in *United States v. Kowalchuk*, 773 F.2d 488, 498 (3rd Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 303 (1986), even though dealing with a denaturalization proceeding, makes the same point:

I quickly recognize that it is always difficult to reconstruct what actually happened at any point in history, and more difficult still when the events of consequence occurred during totally devastating wartime conditions, in enemy territory, over forty years ago. Indeed, this realization lies at the core of the due process issues which I will soon discuss.

\*     \*     \*     \*     \*     \*

But Kowalchuk's due process claim, deemed so insignificant by the majority that they summarily dismissed it, *see* page 498–499, is to me so important an issue that I choose to address it first.

\*     \*     \*     \*     \*     \*

Although I recognize that we would normally not address the constitutional issue if an independent statutory ground supports the outcome, I feel that under these particular circumstances the constitutional violation is so compelling that it requires discussion first. Our Department of Justice required Serge Kowalchuk to defend himself against charges based on events that occurred over forty years ago in the Soviet Union. John Rogers Carroll, an experienced Philadelphia trial lawyer, represented him, but was not able to obtain, interview, or even seek witnesses in the Soviet Union. Attorney Carroll was permitted to travel to the Soviet Union, but, incredibly, was allowed to interview only those witnesses obtained and controlled by the Soviet government. Mr. Carroll, Kowalchuk's attorney, was also not permitted to visit Lubomyl, for the purpose of either obtaining witnesses or collecting physical evidence; incredibly he was denied access to the very town where the government claims the illegal conduct of Kowalchuk took place. App. at 1689. The Soviets sowed the seeds of these proceedings by blasting away accusations against Kowalchuk in Trud, the house organ of the KGB. When this American citizen, Kowalchuk, attempted to prepare a defense to these Soviet-instigated charges, he found the Soviet fox to be the keeper of the chicken house. Kowalchuk's contention, therefore, goes far beyond an argument that he was

denied the opportunity to interview potential witnesses. Rather, it is that he was denied the opportunity to develop a meaningful defense of any type. Because I believe that the right to present witnesses and establish a defense is a fundamental element of due process of law, I also believe that revocation of Serge Kowalchuk's citizenship, under the circumstances here, constitutes a blatant violation of a very precious fundamental right.

\*      \*      \*      \*      \*      \*

Professor Raul Hilberg, one of the Government witnesses, acknowledged that Soviet authorities tightly control all access to all documents concerning World War II war crimes. *Id.* at 827–30. Additionally, testimony of the defense witnesses established that Soviet authorities routinely manipulate witnesses, especially in political trials, and that any efforts by defendant to obtain favorable evidence from Soviet citizens would endanger those citizens' safety. *Id.* at 1401.

Other courts have expressed hesitancy in crediting evidence from Soviet sources. In *United States v. Kungys,* 571 F.Supp. 1104 (D.N.J.1983), a case involving facts that are quite similar to those of this appeal, the court emphasized the Soviet's motivation for discrediting emigres:

> Despite Soviet conquest [of Lithuania] there remain strong nationalistic feelings and continuing allegiance by a significant portion of the population to the Roman Catholic Church. The attempts by Soviet authorities to stamp out these influences and to create the myth of historic friendship between the people of the Soviet Union and its various national groups are weakened by the presence abroad of large groups of emigres who experienced personally the effects of Soviet occupation and who help keep alive Lithuanian national and religious convictions . . .

In 1964 there was formed the Latvian Committee for Cultural Relations of Latvians abroad, and during 1970–76 Lesinskis [a Latvian member of the KGB who defected in 1978] was chairman of its presidium, receiving instructions from the KGB. Its objective was also to discredit Latvian emigres, particularly those who actively sought the end of the Soviet occupation. This was accomplished by publication of books and articles purporting to describe the war crimes and collaboration of which emigres were guilty. The facts were often embellished and supplemented with forged documents, false testimony and pure invention. When he was assigned to a post in the United States, Lesinskis' job was to obtain information about Latvian communities abroad, to promote discord within them and to discredit their leaders. All of this was a KGB function.

*Id.* at 1124. The court concluded that:

> We are faced with a situation where the Soviet Union has a continuing, strong state interest in a finding that defendant was guilty of atrocious conduct while collaborating with German occupation forces. We also are faced with the fact that the Soviet Union uses special procedures in political cases such as this which, on occasion at least, result in false or distorted evidence in order to achieve the result which the state interest requires.

*Id.* at 1126.

In *Kungys* the district court found the government's evidence not credible and denied the government's petition to revoke Kungys's citizenship. The court rebuked the government for its use of Soviet supplied evidence:

> The government elected to collaborate in the prosecution of this case with the Soviet Union, a totalitarian state. It has accepted the assistance of Soviet authorities, particularly the testimony of witnesses who had been interrogated by Soviet investigators and from whom statements had been obtained by those interrogators.
>
> Knowing the nature of the Soviet legal system, the government had an obligation to make every effort to ensure that the testimony it received under the auspices of the Soviet authorities was not tainted by the known Soviet practices designed to obtain the desired results in a particular case even at the expense of the truth. If the government deputizes a totalitarian state to obtain for it evidence to be used in

a United States court, the government must take whatever steps are necessary to ensure that the evidence was not coerced or otherwise tainted by improper pressures.

*Id.* at 1131–32. *See also United States v. Sprogis,* 763 F.2d 115, 120–21 (2d Cir. 1985); *Laipenieks v. I.N.S.,* 750 F.2d 1427, 1435–36 (9th Cir.1985).

Congruent with the Supreme Court's teaching in *Washington,* I conclude that a significant deprivation of due process occurred because the Soviet authorities controlled both the witnesses supplied to the government and Kowalchuk's access to any possible exculpatory information.

It is apparent that the only archival evidence supporting respondent's contention that Kalejs was a member of the Arajs Kommando was provided directly or indirectly by Soviet authorities. It is obvious that those authorities had full access to the archives. They could pick and choose therefrom as they wished. The Soviet Union not only refused Kalejs access to archival documents and to actual and potential witnesses, but, to repeat, it also refused such access to our government.

The respondent argues that Mr. Kalejs has not demonstrated that any additional relevant archival documents exist. However, it is interesting to note that two days before oral argument in this case the government produced protocols that it had just discovered. And we know that the Soviet government has consistently lied about its own role in many of the pertinent historical events. It will be recalled that the Soviets attempted to place responsibility on the Nazis for the massacre of the Polish officers in the Katyn Forrest. It has only recently been acknowledged that the Communist forces were responsible for that crime. The "Cold War" was still on when the depositions in this case were taken under the supervision of Soviet officials.

The OSI's reliance on, and defense of, Communist gathered evidence has frequently been brought into question, most recently in the case of *Demjanjuk v. Petrovsky,* 776 F.2d 571 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

On June 3, 1992 the Sixth Circuit called upon the OSI to describe evidence that it had showing that Demjanjuk was not "Ivan the Terrible" and to state when they obtained that evidence. It will be recalled that Mr. Demjanjuk had, between the 1985 extradition and the date of the Sixth Circuit order in 1992, been tried and sentenced to death in Israel. The Sixth Circuit called upon Judge Tom Wiseman, as Special Master, to take evidence and determine if there had been any fraud upon the Court. Judge Wiseman recently filed his 195 page report which essentially absolves the government attorneys of any intentional wrongdoing. Nevertheless, his findings show how both Mr. Demjanjuk and the judicial process were prejudiced by the manner in which the case was handled. He states, inter alia:

> The Soviet evidence, viewed in its entirety, casts a substantial doubt on Mr. Demjanjuk's factual guilt of the central allegation of the denaturalization complaint—that he was Ivan the Terrible of the Treblinka gas chambers. The statements of former Treblinka guards and laborers *recently obtained from the Soviet Union* constitute an harmonious chorus which inculpate a man named Ivan Marchenko as the Ivan who worked at the gas chambers, and thus exculpate Mr. Demjanjuk from those specific crimes.

> \*    \*    \*    \*    \*    \*

What is particularly telling about this evidence is that it provides no corroboration for the key elements of the government's theory in the denaturalization trial. For example, there are no additional witnesses naming Mr. Demjanjuk as a motorist of the gas chambers. Nor do the statements provide any support for the transfers of the sort Mr. Moscowitz hypothesized could explain the evidence. As Mr. Parker observed, the evidence in 1980 suggested that there were two roads, one leading toward the Treblinka gas chambers, the other toward Treblinka. The road to the Treblinka gas chambers is not developed at all by the new Soviet evidence, and the evidence's silence on the question of his presence at the gas cham-

bers speaks loudest of all. (Emphasis added)

Other comments of Judge Wiseman bear repeating:

> Ultimately, this is a case about questions that were never asked, and questions asked that went unanswered. Government attorneys failed to ask questions regarding the evidence they possessed, and this error prevented them from asking questions designed to obtain additional evidence.
>
> Government attorneys failed to challenge the evidence they possessed, and this led them to abandon leads which contradicted their interpretation of the evidence.
>
> ❋ ❋ ❋ ❋ ❋ ❋

Thus, the government was inadequately skeptical of this theory to begin with, and this shortcoming was compounded by the unintended silencing of the lone dissenting voice—Mr. Parker's. If Mr. Ryan and Mr. Moscowitz had received and read his February 26, 1980 memorandum, the latent suspicions about the case may have been resolved in the light of day. Mr. Parker had believed that they understood the gravity of his feelings about the case, and this misunderstanding eventually resulted in his resignation.

In specific terms, the prosecutors never attempted to prove the null hypothesis—an alternative hypothesis which is the converse of that in which one believes. In the Demjanjuk case, attempting to prove the null hypothesis would have led the government investigators and attorneys to look for evidence that someone other than John Demjanjuk was Ivan the Terrible. Ironically, Allan Ryan, Jr., described this process in his book *Quiet Neighbors*, in describing the reinvestigation of the case of Frank Walus:

> 'My aim was to follow two distinct lines of investigation: first, to reexamine the existing evidence, both the prosecution and defense; second, to search for any new evidence that would shed light on the truth.'

In addition, the case is about questions asked that went unanswered. As I have discussed above, a careful reading of Mr. Demjanjuk's discovery requests demonstrates that he asked for virtually every piece of evidence that is at issue in these proceedings. As demonstrated, the government did not provide the evidence because it believed that it was under no duty to do so. The heart of the discovery problems, therefore, was a tragic misunderstanding.

These difficulties were only compounded, however, by the attitude the trial attorneys took toward discovery; an attitude that at times bordered on gamesmanship.[7]

---

7. Using the null hypothesis here, one would first examine Mr. Kalejs' own story of his life during the years 1941–1944. That story may not be true, but it *could* be, and portions of it are supported by other evidence. Briefly the explanation given by Mr. Kalejs at trial and in his precharge statement (when he was unrepresented by counsel) is summarized in his Reply Brief as follows:

> Kalejs consistently denied membership in Arajs Kommando first in his precharge unrepresented sworn statement and at trial (v.5, 1953). Kalejs returned to Riga after the Soviet invasion and after his desertion from the Soviet Army. As required, he registered as a former Latvia Army officer in Riga (2001, 1964) He wanted to attend the University of Riga (1888). He needed to obtain certificates to vouch for service against the Soviets (1983). He obtained such certificates from a friend (1890, 1985). These were submitted to the University and he gained admission (1889). He studied there for one semester in the fall of 1941. In early 1942 he was then called to service in a Latvian ski company (1969). He developed ulcers (1903) and returned to Riga in 1942 and was hospitalized (1990). After he was released as unfit for duty he returned to his University studies (1904) until near the end of the war when he joined the Latvian Legion (1907). During school vacation periods, he performed farm labor for friends he had met away from Riga (1904, 1981). His testimony was corroborated. Burger testified Arajs told him that the Arajs Kommando often prepared false certificates for Latvians since the Germans would make little effort to be of assistance to Latvians (v.5, 1784,5). Mrs. Namguads and her daughter, Mrs. Kula, testified he had lived with them prior to the Soviet invasion (v.5, 1796, 1848). He then left. He returned later sick with ulcers (v.5, 1799), 1854) and worked on their farm and neighboring farms from time to time during the war (v. 5, 1797, 1850). Mr. Olins testified he saw and spoke to Kalejs in Riga in late 1942 (v.5, 1865) and Kalejs was ill with stomach problems (v.5, 1866).

Of course there are many good reasons to be skeptical. The majority opinion, for instance, asks:

There is nothing to suggest that the intramural problems that beset the prosecution in the *Demjanjuk* case in any way affected this case. But the attitude of the government toward the due process rights of the respondent here, particularly with respect to discovery, appear similar to those of the government in its dealings with Mr. Demjanjuk. So *Demjanjuk* is cited to emphasize the hazards that exist in any proceeding where the evidence is controlled by unreliable third parties, the prosecution is not sensitive to the charged party's rights, *and* judicial quality due process standards for discovery, the admission of evidence, the conduct of depositions, and cross-examination of witnesses are not adequately recognized and enforced.

I urge a straightforward recognition that, either under 8 C.F.R. § 242.16 (1988) or the United States Constitution, or both, aliens in deportation cases such as this are entitled to discovery just as other civil litigants in our United States District Courts. And certainly the government should be required to disclose any exculpatory evidence of which it has knowledge. See Judge Tom Wiseman's discussion of *Brady* in his report in *Demjanjuk*. The right of cross-examination is trivialized if the alien does not have fair and reasonable access to potential witnesses, documentary evidence and site investigation. What is fair and reasonable in any case will depend on the circumstances, but complete stonewalling, whether by our government or by another government, will require that evidence tainted by such restrictions be disregarded. The government states in its brief:

Where, as here, the government states that to its knowledge the only extant statements are those it has turned over to Kalejs, immigration law imposes no duty

on the court or the government to determine whether other statements may exist merely because Kalejs' attorney so alleges.

But an absolute cut-off of access to potentially relevant prior statements of any deponent known to exist should bar the use of such deponent's testimony. Here the government was aware by virtue of the Soviet deponents' testimony that prior statements were made and that a report or transcript thereof possibly still existed. The government did not have to rely merely on Mr. Kalejs' attorney's allegations; it heard the witnesses describe such prior statements.

The government also states that Mr. Kalejs had some independent source of certain prior statements made by some of the Soviet witnesses so it observes, "It is open to question whether Kalejs is actually missing *any* prior protocols or, if any are missing, whether they are material." Exactly! No one knows, *except* the Soviet authorities. The petitioner does not know. The government does not know. Only the Soviet authorities know or can find out, absent access to the archives by our government and/or the petitioner.

Each of the charges that resulted in findings against Mr. Kalejs depend upon proof that he was a member of the Arajs Kommando. It is my opinion that the record does not contain enough substantial competent evidence to meet the clear and convincing standard on this key factual issue. I further conclude that the consequence of this decision undercuts the government's contention that Mr. Kalejs made a materially false statement on his Visa application. I therefore conclude that the deportation order can not be affirmed on this record.[8] However, I do

---

He does not explain, for example, how he so easily obtained affidavits identifying him as not merely a member but an officer of the Arajs Kommando, or why he didn't simply obtain a certificate from the unit he claimed to be a member of. It is also incredible that the Germans would have continued to pay the military salary of a Latvian soldier for two-and-a-half years while he was recuperating from an ulcer, studying and laboring on a farm. Kalejs claims to have had no knowledge of the mass executions of Jews outside Riga, but according to expert testimony the subject had set the town abuzz at the time. And Kalejs admitted

to serving under a general who was head of the Einsatzgruppe, the mobile killing unit, in Latvia, although he later tried to distance himself from this testimony.

What is needed is a new proceeding and new trial in which all reasonably available relevant evidence is brought forth, to the end that the truth may be uncovered.

8. I have stated that it is my opinion that this record, absent the tainted evidence, would not sustain a factual conclusion that Mr. Kalejs was a member of the Arajs Kommando or assisted in

not believe that the record requires us to dismiss the entire proceeding. Rather it is my opinion that a new trial should be ordered consistent with the view expressed herein.

Conditions in Russia and Latvia have changed dramatically in the last two years. If a new trial is held, who knows what may happen?

Perhaps, indeed probably, the Latvian and Russian authorities will now allow direct, private, access to the witnesses, to the archives, and to site investigations. If so, the government would have then, for the first time, the opportunity to carefully evaluate its case in the light of any evidence that this new access might provide. It would then know which Soviet witnesses to vouch for and which not to vouch for, and which documents exist that support or weaken Mr. Kalejs' testimony concerning his life between July 1941 and 1944.

Of course, it is possible that this new access would produce no new documentary evidence, either because it never existed, was lost or destroyed over the years, or because the departing Communists officials took or destroyed such evidence. Reality will have to be dealt with.

Still, any decision based upon all of the available relevant evidence will enjoy much more credibility than the decision we now examine.

I therefore respectfully dissent.

### ORDER

The petition for rehearing filed by petitioner on December 1, 1993, is hereby DENIED. However, Judge Eisele dissents since he favors a rehearing on the ground that the matter should be remanded to require a completely new evidentiary hearing upon the basis of the representations made in the petition for rehearing and upon the basis of the views originally stated in his dissent.

---

persecution. But what if I believed the non-tainted evidence would suffice for that purpose?

The suggestion that we should affirm if we determine that the competent, non-Soviet, evidence would be sufficient to sustain the decisions of the IJ and the BIA raises an additional question in a deportation case such as this where administrative discretion is broad: *Would* the IJ or the BIA have determined that Mr. Kalejs was a member of the Arajs Kommando and assisted in persecution in the absence of the tainted evidence? One hesitates to assume that, if they *could* have so found on the competent evidence, they necessarily *would* have so found. This same type of inquiry is pertinent to the visa misrepresentation issue: If the competent evidence would permit the finding that Mr. Kalejs made a willful false statement as to a material matter not related to his membership in the Arajs Kommando, can we assume that such a finding would have been made? Indeed one may question whether any deportation proceeding against Mr. Kalejs would have been initiated absent the belief that Mr. Kalejs had assisted in persecution.