In the

# United States Court of Appeals

### For the Seventh Circuit

―――――

No. 01-1508

PETER TOPTCHEV and TANIA TOPTCHEVA,

*Petitioners*,

*v.*

IMMIGRATION AND NATURALIZATION SERVICE,

*Respondent.*

―――――

On Petition for Review
from the Board of Immigration Appeals
Nos. A72 130 046 and A72 130 045

―――――

ARGUED SEPTEMBER 20, 2001—DECIDED JULY 3, 2002

―――――

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Petitioners Peter Toptchev and
Tania Toptcheva, husband and wife, are natives and citi-
zens of Bulgaria. After they entered this country without
inspection in 1993, the Immigration and Naturalization
Service (INS) placed them in deportation proceedings. Pe-
titioners conceded that they were subject to deportation
but sought asylum or withholding of deportation based on
a number of adverse experiences in Bulgaria that they
ascribe to official persecution based on Toptchev's political
and religious beliefs. The Immigration Judge (IJ) concluded
that the petitioners had not established a well-founded
fear of persecution in the event of their return to Bulgaria,
and the Board of Immigration Appeals (the BIA or the

Board), concurring in that finding, dismissed their appeals. The petitioners have filed a petition for review of the BIA's decision and ask us to reverse. We affirm the BIA's decision and deny the petition for review.

## I.

Peter Toptchev played soccer professionally in Bulgaria for twenty years, and for a period of time he played on the national team. As a result of his athletic career, he was well-known in Bulgaria. When he retired from the sport, Toptchev obtained an associate degree in international tourism from the International Tourism Institute, and he later earned a second degree in soccer coaching from the Sports Institute. He found work as an administrative assistant doing auditing at a hotel that had an international clientele. Toptchev also sought out positions as a soccer coach, but it appears that he was never able to hold a coaching position, which he attributes to his problems with the Bulgarian authorities.

Toptchev believes that he fell into disfavor with Bulgarian security personnel for two reasons: He is Catholic, and Catholics are a religious minority in Bulgaria, and he describes his political views as anti-totalitarian (Toptchev had declined an invitation to join the Communist Party). After a series of run-ins with the Bulgarian authorities and other adverse incidents, Toptchev concluded that he could not safely remain in Bulgaria given his religious and political beliefs. He obtained permission to depart Bulgaria in January 1990 and has not returned since that time.

Two of the incidents that gave rise to Toptchev's belief date back to the 1960s: In 1964, when Toptchev was 17, a police officer accosted him while he was awaiting a streetcar because Toptchev was dressed in Western-style clothing. Three years later, when Toptchev was playing for a soccer team in the town of Shumen, state security police

confiscated a Bible, a crucifix, and religious icons from his residence, took him to a police station, struck him in the face, and detained him for three days; police also searched his home in the capital city of Sofia.

The next incident took place in 1984, when state security officials again detained Toptchev, this time for fraternizing with foreign citizens. It seems that Toptchev had agreed to have dinner with foreign guests who were staying at the hotel where he worked. (Toptchev had already come under suspicion because he, unlike other hotel workers, declined to fill out reports on the hotel's foreign guests.) Officials released him from custody only after he signed a written statement acknowledging that he was to avoid such contact in the future. A regional security officer, Captain Nikolov, warned Toptchev that he would suffer a two-year banishment from the city of Sofia if he violated the agreement. In the wake of this incident, Toptchev lost his position as a coach for a soccer team; he later learned that this was Nikolov's doing. He encountered a similar fate in subsequent coaching positions.

In 1988, Toptchev witnessed someone push his friend Neven Ovcharov into the path of an oncoming streetcar. Ovcharov, whom Toptchev describes as a prominent writer and dissident, was mortally wounded in the incident. Afterwards, Toptchev testified, the police told him not to testify in support of a legal action brought by Ovcharov's survivors. He also received a telephone call from an unidentified caller, whom he believed to be Captain Nikolov, warning him to remain silent or his life would be in danger. Soon afterward, a truck attempted to ram Toptchev's car, and he believed this to be an attempt on his own life. Two years later, after Toptchev had left Bulgaria, a second friend, Stoyan Petkov, perished in a suspicious automobile explosion.

Several months after Toptchev's departure from Bulgaria, Captain Nikolov paid a visit to his wife to inquire where

Toptchev had gone. The visit left Toptcheva unsettled, and she decided to move in with her in-laws. Over the next several months, according to Toptcheva, Nikolov repeatedly harassed her. In April of 1990, when Toptcheva stopped by her home to pick up some clothes, Nikolov forced his way into the apartment, grabbed her blouse, and opened it. "[H]e just did not look like a human being," she testified. A.R. 94. "He looked like an animal and I think, you know, his intention was to rape me . . . ." *Id.* After her screams summoned neighbors, Nikolov broke off the assault and ran away. When Toptcheva reported the incident to his superiors, Nikolov visited her yet again and threatened her. A month later, Toptcheva, a chemical engineer, lost her job of fourteen years with a chemical manufacturer. Her boss told her that she was an excellent employee, but explained that he had "too many political problems" with respect to her family and that he was under pressure to fire her. A.R. 97. Meanwhile, Nikolov continued to follow and harass Toptcheva, warning her that "this was just the beginning of [her] problems." A.R. 98. Finally, in July 1990, Toptcheva obtained an exit visa and joined her husband in Canada, where they both sought asylum.

The petitioners have a son, Ivo Toptchev, who remained in Bulgaria after their departure. In 1991, he was hospitalized for an extended period of time after two people assaulted him and broke his leg. Because his attackers took nothing from him, both he and the petitioners suspect that the attack was orchestrated by Captain Nikolov. He experienced no further attacks after this incident. Eventually, however, he and his wife also made the decision to leave Bulgaria and seek asylum in the United States.[1]

---

[1] An Immigration Judge granted asylum to Ivo Toptchev on January 21, 1997. The parties now agree that the judge granted him
(continued...)

At the time of the hearing before the IJ, other relatives of Toptchev and Toptcheva remained in Bulgaria. Toptchev's parents continued to live there on his father's pension. His brother lived there as well and worked as a researcher for an ecological institute. Toptcheva's father, whose political differences with the government led to his imprisonment in the late 1970s, also remained in Bulgaria and collected a pension.

The petitioners still own a condominium in Bulgaria as well. According to Toptcheva, it was broken into after their departure; but the record tells us nothing more about the circumstances of the break-in.

After the Canadian authorities denied their application for refugee status, the petitioners entered the United States illegally in January 1993. In November of that year, they were served with orders to show cause why they should not be deported. As noted above, the petitioners conceded deportability, *see* A.R. 44, but sought asylum or, alternatively,

---

[1] (...continued)

asylum based on persecution suffered by his wife due to her Romani ethnicity; however, at the time we heard oral argument in this case, the parties were not privy to the rationale underlying the grant of asylum. In order to clarify that point, we asked the Service's counsel to supplement the record in this appeal with a copy of the administrative record of proceedings conducted on Ivo Toptchev's asylum claim. The INS complied with our request. It has also asked us to disregard that supplemental record, however, arguing (1) that we lack authority to consider evidence that was not before the Board, and (2) that the grant of Ivo Toptchev's asylum request was derivative of his wife's claim and therefore unrelated to his parents' asylum claim. Because the parties agree that the Ivo Toptchev proceeding has no bearing on the petitioners' appeal, we shall indeed disregard the record of that proceeding. We thank the INS for complying with our request and submitting that record.

withholding of deportation based on the incidents identified above, which they attributed to Toptchev's religious and political beliefs.

Following an evidentiary hearing on December 13, 1994, the IJ delivered an oral decision denying the petitioners' request for asylum and withholding of deportation. As a threshold matter, the IJ determined that "the record does not reveal a level of mistreatment that can be characterized as past persecution so as to warrant a finding of statutory eligibility for asylum." IJ Decision at 7. The IJ observed that (1) the petitioners both had been able to obtain graduate-level degrees; (2) Toptchev and Toptcheva (until her discharge shortly before her departure) both had been successfully employed in Bulgaria; (3) neither had ever been formally charged with any offense; (4) there was no record evidence to support a claim of past persecution based on their religious beliefs; (5) their negative experiences with Captain Nikolov did not rise to the level of persecution and in any case petitioners had not shown that relocation so as to avoid further harassment by him was infeasible; and (6) both petitioners had been able to secure official permission to depart Bulgaria without evident difficulty. *Id.* at 7-8.

Alternatively, the IJ found that the petitioners had not established a likelihood of present or future persecution in Bulgaria. The IJ noted that according to a May 1994 *Profile of Asylum Claims and Country Conditions* in Bulgaria prepared by the U.S. State Department's Office of Asylum Affairs (Bureau of Human and Humanitarian Rights), the country had made significant strides toward democracy following the overthrow of communist dictator Todor Zhivkov in late 1989. In the opinion of the Department, mistreatment that had taken place during the communist era was unlikely to persist in the future, at least on a national level. Mistreatment of Bulgarian citizens, if it did recur, was most likely to manifest itself on the local level, and could thus be

avoided by relocation. *Id.* at 6-7; *see* A.R. 128-30. The IJ noted that the petitioners had adduced no evidence calling into question the State Department's assessment or which otherwise suggested that the "political landscape" in Bulgaria had remained unchanged since their departure. IJ Decision at 9-10. He also pointed out that Toptchev's retired parents continued to live in Bulgaria on pensions and his brother remained employed as a researcher, and, so far as the evidence revealed, none of them had suffered any negative consequences due to Toptchev's political views or his departure from the country. *Id.* at 10. Although the Toptchevs' son had been attacked, the evidence was not sufficient to establish that the attack had anything to do with the Toptchevs' perceived political views or that it was instigated or condoned by government authorities. *Id.* Likewise, the evidence did not, in the IJ's view, establish that Neven Ovcharov's death was orchestrated by the Bulgarian authorities in retribution for political views that could be imputed to the Toptchevs. *Id.*

Having concluded that the Toptchevs had established neither past persecution nor a likelihood of persecution upon return to Bulgaria, the IJ denied their request for asylum. *Id.* at 10-11. Noting that the requirements for withholding of deportation were more demanding than those for asylum, the IJ found them ineligible for withholding of deportation on the same basis. *Id.* at 11.

The Toptchevs appealed the IJ's decision to the BIA and in a January 31, 2001 decision, the Board concurred in the denial of asylum and withholding of deportation and dismissed the petitioners' appeal. The BIA took administrative notice of the Department of State's 1999 *Country Reports on Human Rights Practices* (Feb. 23, 2000). The *Country Report* on Bulgaria confirmed that the country was now a parliamentary republic in which the government was democratically elected and religious freedom was guaran-

teed. BIA Decision at 2. In view of the progress that the country had made since the overthrow of its communist regime, the Board agreed with the IJ that the evidence did not supply grounds for a well-founded fear of persecution in the event of the petitioners' return to Bulgaria. *Id.* at 2-3.

## II.

We have jurisdiction to review the BIA's decision pursuant to section 106 of the Immigration and Nationality Act (the "INA" or the "Act"), 8 U.S.C. § 1105a (1994).[2]

Section 208(a) of the Act grants the U.S. Attorney General broad discretion to bestow asylum on any alien who qualifies as a "refugee." 8 U.S.C. § 1158(b)(1). The INA in turn defines "refugee" as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A). The statute does not supply a definition of "persecution," but we have repeatedly described it as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *E.g.*, *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002). As we have also indicated, persecution means more than harassment and may include such actions as "'detention, arrest,

---

2 Section 106 was repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and replaced with a new provision codified at 8 U.S.C. § 1252. The new provision does not apply here, however, because the INS placed the Toptchevs in deportation proceedings prior to April 1, 1997. *See*, *e.g.*, *Karapetian v. INS*, 162 F.3d 933, 935 (7th Cir. 1998).

interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.'" *Id.*, quoting *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995).

A petitioner seeking a discretionary grant of asylum must first establish his statutory eligibility for such relief. *See id.* at 1329. To do that, he must prove either that he has been persecuted in the past or that he has a well-founded fear of future persecution. *E.g.*, *Begzatowski*, 278 F.3d at 669. To be "well-founded," the petitioner's fear of future prosecution must not only be genuine, but objectively reasonable. *Mitev*, 67 F.3d at 1331. Satisfactory proof of past persecution will give rise to a presumption that the petitioner also has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *see, e.g.*, *Begzatowski*, 278 F.3d at 669 (quoting *Ambati v. Reno*, 233 F.3d 1054, 1059-60 (7th Cir. 2000)). However, that presumption is rebuttable, § 208.13(b)(1)(i)(A); *Begzatowski*, 278 F.3d at 669, and if conditions in the petitioner's homeland have improved sufficiently that persecution of the petitioner is unlikely to recur, the Board may deny his request for asylum notwithstanding the petitioner's past persecution. *See, e.g.*, *Vaduva v. INS*, 131 F.3d 689, 690-91 (7th Cir. 1997).

Where, as here, the Board has denied relief to a petitioner seeking asylum, our review is highly deferential; we inquire only whether the Board's decision has the support of "reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S. Ct. 812, 815 (1992); 8 U.S.C. § 1105a(a)(4) (1994). We will disturb the Board's finding only if the record is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.* at 483-84, 112 S. Ct. at 817.

Section 243(h) of the INA requires the Attorney General to withhold a petitioner's deportation if his "life or freedom

would be threatened . . . on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h) (1994). However, the criteria for withholding of deportation are more stringent than those for a grant of asylum. There must be more than just a chance, but rather "a clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 430, 104 S. Ct. 2489, 2501 (1984). The petitioner therefore must show "that it is more likely than not that he or she will be subjected to persecution upon deportation," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 107 S. Ct. 1207, 1212 (1987). A petitioner who has not established a well-founded fear of persecution in support of his asylum claim necessarily has not demonstrated that he faces a "clear probability" of persecution such that he is entitled to withholding of deportation. *E.g.*, *Iliev v. INS*, 127 F.3d 638, 641 (7th Cir. 1997).

In this case, the Board essentially adopted the IJ's decision as its own and added that Bulgaria's continued progress toward democracy, as evidenced by the State Department's *Country Report*, lent additional support to the denial of the petitioners' requests for asylum and withholding of deportation. To the extent the BIA adopted the IJ's decision, we are essentially reviewing the IJ's analysis. *E.g.*, *Dobrican v. INS*, 77 F.3d 164, 167 (7th Cir. 1996). We therefore begin our review with the IJ's decision.

A.  The Immigration Judge's Decision

The Toptchevs contend that the IJ failed to fully consider all of the evidence that they presented on the question of past persecution. In their view, the judge's finding that they had not experienced past persecution rests on the six subsidiary observations we noted above (*see supra* at 6), and these observations in turn betray a focus on irrelevant considerations in some instances and in others an incomplete and (in at least one instance) erroneous understand-

ing of the facts. Based on these purported errors, the Toptchevs assert that the IJ's decision, and the BIA's decision adopting it, are flawed and that the matter should be remanded for a more careful review of the evidence.

However, in their appeal to the BIA, the Toptchevs did not identify the flaws in the six observations that they now maintain were central to the IJ's finding on the question of past persecution. Instead, they simply reasserted that the evidence established a well-founded fear of persecution and asked the BIA to take notice that former communists had regained power in Bulgaria in the 1994 elections. A.R. 16-17, 25. A petitioner who has not first presented an issue to the Board has failed to comply with the statutory requirement that he exhaust his administrative remedies. 8 U.S.C. § 1105a(c) (1994); *see Singh v. Reno*, 182 F.3d 504, 511 (7th Cir. 1999), citing *Mojsilovic v. INS*, 156 F.3d 743, 748 (7th Cir. 1998). As the INS points out, each of the specific errors that the Toptchevs cite to this court could have been addressed by the BIA, had they only been brought to the Board's attention. Because they were not, we lack jurisdiction to address them. § 1105a(c); *e.g.*, *Mojsilovic*, 156 F.3d at 748; *Perez-Rodriguez v. INS*, 3 F.3d 1074, 1080 (7th Cir. 1993).

Thus, we are left to consider generally whether the IJ's decision has the support of substantial evidence, and we conclude that it does. Without deciding the point, we may assume, consistent with the petitioners' appellate argument, that the mistreatment that they experienced prior to their departure amounts to adequate evidence of past persecution. Nonetheless, we must affirm the denial of asylum if the evidence before the IJ supported his finding that the Toptchevs are not likely to be persecuted in the future if returned to Bulgaria. *See*, *e.g.*, *Vaduva*, 131 F.3d at 690-91. As we noted earlier, although evidence of past persecution gives rise to a presumption that the petitioner has a well-founded fear of future persecution, the presumption is

rebuttable. *See Begzatowski*, 278 F.3d at 669. The pertinent regulation on asylum eligibility specifies that an immigration judge "*shall* deny the asylum application of an alien found to be a refugee on the basis of past persecution if . . . [inter alia] [t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 C.F.R. § 208.13(b)(1)(i)(A) (emphasis supplied). The regulation does identify an exception for cases in which there are "compelling reasons . . . arising out of the severity of the past persecution" for an applicant being unwilling to return to his or her native country notwithstanding the unlikelihood of future prosecution. § 208.13(b)(iii)(A). However, "[o]nly in rare cases is past persecution 'so severe that it would be inhumane to return the alien to his native country even in the absence of any risk of future persecution.'" *Dobrota v. INS*, 195 F.3d 970, 974 (7th Cir. 1999) (quoting *Vaduva*, 131 F.3d at 690). This is not one of those rare cases.

Here, the IJ concluded that even if the petitioners had successfully established some form of past persecution, they were unlikely to experience a recurrence of that persecution upon return to Bulgaria, given the passage of time since their departure coupled with the country's progress toward democracy. IJ Decision at 8-9, 10-11. The IJ's conclusion was based in significant part on the State Department's 1994 *Profile of Asylum Claims and Country Conditions* in Bulgaria, *see* IJ Decision at 6-7, along with the petitioners' failure to present any evidence rebutting the State Department's assessment or otherwise suggesting that the "political landscape" in Bulgaria remained unchanged, *id.* at 9. As this court has noted repeatedly, the Board reasonably may rely upon the State Department's assessment of current country conditions as they relate to the likelihood of

future persecution, given the Department's expertise in international affairs. *E.g.*, *Vaduva*, 131 F.3d at 691; *see* 8 C.F.R. § 208.12(a). The Department's *Profile* supports the IJ's finding with respect to future persecution, *e.g.*, *Tamas-Mercea v. INS*, 222 F.3d 417, 424-25 (7th Cir. 2000), and particularly in the absence of evidence calling the State Department's opinion into question, we have no reason to question the judge's reliance on it.

Additional record evidence, which has a more specific bearing on the likelihood that the Toptchevs will be persecuted, also supports the IJ's assessment. First, as the IJ noted, Toptchev's parents and his brother continued to live in Bulgaria—his parents were retired and lived on his father's pension, and his brother was working as a researcher. A.R. 85-86, 87. So far as the record revealed, none of these family members had had a run-in with Bulgarian authorities since his departure from the country. *See* IJ Decision at 10. Likewise, the IJ heard evidence that Toptcheva's father continued to live in Bulgaria and collect a pension. A.R. 108. The fact that the petitioners' family members continue to live unmolested in their native country supports the conclusion that the petitioners lack a well-founded fear of persecution. *See Tzankov v. INS*, 107 F.3d 516, 520 (7th Cir. 1997), citing *Mitev*, 67 F.3d at 1332. Second, as the IJ also noted, both Toptchev and Toptcheva were able to obtain passports and official permission to leave Bulgaria.[3] *See* A.R. 78, 103-04; IJ Decision at 8. That the government did not interfere with their efforts to leave the country tends to undermine the notion that they will be persecuted if returned to Bulgaria. *See*, *e.g.*, *Dobrota*, 195

---

[3] The IJ cited this fact in support of his finding that the petitioners had not experienced past persecution, *see* IJ Decision at 8, but it also is relevant to the likelihood that they might experience future persecution.

F.3d at 974; *Gonzalez v. INS*, 77 F.3d 1015, 1022 (7th Cir. 1996). Third, Toptchev testified that he and his wife still own a (now-unoccupied) condominium in Bulgaria. A.R. 76, 82-83.[4] That the government apparently has not interfered with the Toptchevs' property again supports the IJ's finding that future persecution is unlikely. *Sayaxing v. INS*, 179 F.3d 515, 522 (7th Cir. 1999); *see generally*, *e.g.*, *Begzatowski*, 278 F.3d at 669 (citing confiscation of property as an example of activity that can constitute persecution), quoting *Mitev*, 67 F.3d at 1330. Certainly, none of these circumstances forecloses the possibility of future prosecution, but collectively, and along with the *Profile*, they amount to "reasonable, substantial, and probative evidence" supporting the IJ's determination that the petitioners do not have a sufficiently well-founded fear of persecution to warrant a grant of asylum under the INA. *Elias-Zacaria*, 502 U.S. at 481, 112 S. Ct. at 815.

## B. The Board's Decision

When it affirmed the IJ's decision in 2001, the Board cited the State Department's 1999 *Country Reports on Human Rights Practices* as additional evidence indicating that the Toptchevs lack a well-founded fear of future persecution upon return to Bulgaria. The Board was free to take administrative notice of this publication as evidence of improved conditions in the petitioners' homeland, so long as the Board did not neglect to undertake a particularized review of the petitioners' case. *E.g.*, *Meghani v. INS*, 236 F.3d 843, 848 (7th Cir. 2001). The face of the BIA's order reveals that the Board in fact did engage in a particularized review of

---

[4] Toptcheva testified that someone had broken into the condominium in 1992 or 1993, A.R. 106, but the record gives us no reason to believe that the break-in was anything but an ordinary burglary.

the Toptchevs' case, *see Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000). At the same time, the 1999 *Country Report* on Bulgaria supports the Board's conclusion that the petitioners are unlikely to experience persecution upon their return to Bulgaria given that country's continued evolution toward a democratic state. Although conditions in Bulgaria vis à vis human rights remain far from perfect, Bulgaria now has a record of several democratic elections, its constitution recognizes freedom of religion, and in fact religious minorities are tolerated. *See Country Reports on Human Rights Practices* (Feb. 23, 2000), <http://www.state.gov/g/drl/rls/hrrpt/1999/322.htm>. Coupled with the evidentiary record upon which the IJ relied, the 1999 *Country Report* on Bulgaria establishes an adequate evidentiary basis for the Board's conclusion. *E.g.*, *Tomas-Mercea*, 222 F.3d at 424-25.

The Toptchevs suggest that they were deprived of the opportunity to rebut the information contained in the *Country Report*, but we disagree. The Toptchevs were represented by counsel in their appeal to the Board, and the BIA's decision to take administrative notice of the (then) current *Country Report* on Bulgaria could not reasonably have taken their attorney by surprise, given the regularity with which the Board relies on the *Country Reports*. The IJ himself had relied upon the State Department's *Profile of Asylum Claims and Country Conditions* in Bulgaria when he concluded that the Toptchevs were unlikely to encounter future persecution, so it was entirely foreseeable that the Board would look to that and similar information when it addressed the petitioners' appeal. Indeed, the petitioners themselves asked the Board to take administrative notice of the communists' re-ascension to power in the 1994 Bulgarian elections. A.R. 17. Finally, once they received the Board's decision, the Toptchevs could have filed a motion with the Board asking it to reopen their case so that they might present new evidence rebutting the facts of which the

Board had taken notice. *See* 8 C.F.R. § 3.2; *Sivaainkaran v. INS*, 972 F.2d 161, 166 (7th Cir. 1992); *Kaczmarczyk v. INS*, 933 F.2d 588, 597 (7th Cir.), *cert. denied*, 502 U.S. 981, 112 S. Ct. 583 (1991). Having elected not to pursue that option, the Toptchevs may not now complain that they were precluded from responding to the *Country Report* on which the Board relied.

For all of these reasons, we conclude that the decision to deny the Toptchevs' application for asylum has the requisite evidentiary foundation. It follows inevitably that the denial of their request for withholding of deportation, which is governed by more stringent criteria, was likewise proper.

## III.

We AFFIRM the decision of the Board of Immigration Appeals and DENY the petition for review.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-97-C-006—7-3-02