**Serguei BELIAEV and Svetlana Kouznetsova, Petitioners,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–3181.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 2003.

Decided Dec. 1, 2003.

Bruce A. Slivnick, Deerfield, IL, for Petitioners.

George P. Katsivalis, Department of Homeland Security, Chicago, IL, Richard M. Evans, Paul Fiorino, Department of Justice, Washington, DC, for Respondent.

Before POSNER, KANNE, and WILLIAMS, Circuit Judges.

**ORDER**

Serguei Beliaev and his wife sought asylum or withholding of removal in the United States on the ground that Beliaev had suffered persecution in Russia due to his Jewish religion and nationality. An immigration judge denied their claims, and the Board of Immigration Appeals affirmed without opinion. Because country conditions in Russia are such that Beliaev has not established a well-founded fear of persecution, we affirm.

## I. BACKGROUND[1]

Serguei Beliaev was born in St. Petersburg,[2] Russia to a Jewish mother and Russian father. His mother introduced him to

---

1. The facts below reflect Beliaev's version of events as set forth in his brief.

2. St. Petersburg was called Leningrad during certain periods relevant to this case.

Jewish traditions and holidays, while his maternal grandfather instilled him with Jewish pride "despite the fact that [Beliaev] is not religious." Although he could have listed himself as Russian on his passport, Beliaev chose to be listed as Jewish due to his mother's efforts and his respect for his grandfather.

Beliaev was suspended from college after numerous confrontations with an anti-Semitic director. Although he finished his studies, he was sent to Murmansk, a location he considered undesirable, as punishment for being Jewish. After working there for over three years, Beliaev was framed and fired by his anti-Semitic supervisors. He returned to St. Petersburg, where he could not find work in his field (commercial shipping) due to his Jewish heritage. In 1988, he settled for a job as an administrative assistant in a café owned by a Jew. The café was partially destroyed by anti-Semitic vandals in February 1990. Authorities refused to help, and instead suspended the owner's café license.

On two occasions in 1990, Beliaev was physically attacked by members of Pamyat, an anti-Semitic organization that the authorities refused to control. The first attack required a three-day hospital stay, while the second resulted in a two-week stay. Although his parents filed a complaint with the police department regarding the second incident, the police made Beliaev tear up the complaint, and suggested that he leave St. Petersburg.

The situation worsened in 1991, when Beliaev suffered numerous personal and random attacks by Pamyat members, one of which required a four-day hospital stay due to urinary problems and a fractured nose. Beliaev complained to the police and the prosecutor's office; in response, Pamyat members threatened to kill him if he did not withdraw the complaint and leave Russia immediately. A day after Beliaev was threatened, his mother was detained at gunpoint by two men in military uniforms, who reiterated the threats against Beliaev. The shock caused her to have a heart attack. Beliaev withdrew his complaint, and left for the United States in April 1991.

Beliaev returned to Russia in December 1991, believing that the situation for Jews had improved following the Soviet Union's collapse. He began working for a co-op with close Jewish ties. The co-op was constantly threatened by both Pamyat and the Russian Liberation Movement of the Russian National Unity (RLM), another anti-Semitic organization. Not only did police officers refuse to help, but they sided openly with the attackers.

Between 1992 and 1996, members of Pamyat and the RLM physically attacked Beliaev and made death threats on numerous occasions, at one point beating him so severely that his kneecap had to be surgically restructured. He also received fifteen stitches in his hand, and started having eye problems. The police would not provide assistance (rather, they detained Beliaev in 1995 for selling Jewish newspapers for the co-op), and again suggested that Beliaev leave St. Petersburg. He thus moved to Siberia, and then to the United States in early 1996 with the intention of seeking asylum on account of his Jewish religion and nationality. Once in the United States, he met Svetlana Kouznetsova, also a Russian Jew, and the two married in 1997.

An immigration judge (IJ) denied Beliaev and Kouznetsova's requests for asylum or withholding of removal (Kouznetsova sought asylum through her husband) in 1998. Specifically, the IJ determined that Beliaev was not credible due to various inconsistencies regarding the source of his spiritual development, the dates of the alleged beatings, the extent of his alleged injuries, and the cause of his departure from Russia in 1991. He also found Be-

liaev's testimony implausible in light of the State Department's 1997 Profile of Asylum Claims and Country Conditions for Russia, which indicated that there is no pattern of repeated physical attacks against Jews in Russia.

The IJ further noted that Beliaev had not established that he held himself out to be Jewish while in Russia, and that even if he were to assume that Beliaev's allegations were true, Beliaev's experiences did not rise to the level of persecution on account of his Jewish nationality. Finally, the IJ determined that even if Beliaev had a subjectively genuine fear of persecution, that fear was not objectively reasonable, in part because the State Department's profile indicated improved circumstances for Jews. The Board of Immigration Appeals (BIA) affirmed without opinion in July 2002, and Beliaev and his wife appeal.

## II. ANALYSIS

We review a BIA decision under a "highly deferential" standard; the court "inquire[s] only whether the Board's decision has the support of reasonable, substantial, and probative evidence on the record considered as a whole," and "will disturb the Board's finding only if the record is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Toptchev v. INS,* 295 F.3d 714, 720 (7th Cir.2002) (citations and internal quotation marks omitted). When, as in this case, the BIA affirms without opinion, we review the IJ's decision under this same standard. *See Kharkhan v. Ashcroft,* 336 F.3d 601, 604 (7th Cir.2003).

Here, Beliaev alleges that he has established refugee status due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or

political opinion," 8 U.S.C. § 1101(a)(42)(A), and is therefore entitled to asylum under Section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158. He claims that the IJ lacked an adequate basis for his determinations that Beliaev was not credible, had not suffered past persecution, and was unlikely to suffer future persecution. We need not address the IJ's findings regarding credibility and past persecution, for even if we take Beliaev's allegations as true and find that he was persecuted while in Russia, Beliaev has not shown that he has an objectively reasonable fear of future persecution. *See Toptchev,* 295 F.3d at 721 (assuming, but not deciding, that petitioner had suffered past persecution, but finding that the petitioner had not established a well-founded fear of future persecution).

Beliaev correctly notes that if a petitioner establishes that he suffered past persecution, he is entitled to a rebuttable presumption that he has a well-founded fear of future persecution. *See Begzatowski v. INS,* 278 F.3d 665, 671 (7th Cir.2002); 8 C.F.R. § 208.13(b)(1). Immigration authorities then have the burden of proving that no well-founded fear exists. *See Begzatowski,* 278 F.3d at 671. In this case, the INS met its burden by presenting evidence of improved conditions in Russia. *See Toptchev,* 295 F.3d at 720 ("[I]f conditions in the petitioner's homeland have improved sufficiently that persecution of the petitioner is unlikely to recur, the Board may deny his request for asylum notwithstanding the petitioner's past persecution."); *Begzatowski,* 278 F.3d at 671 ("[T]he presumption [of a well-founded fear] may be overcome by evidence indicating that the alien no longer is in danger of being persecuted again due to changed conditions in the home country.") (internal quotation marks omitted).[3]

---

**3.** *Marquez v. INS,* 105 F.3d 374 (7th Cir.1997)    describes an exception to this rule, stating

Specifically, the INS presented the State Department's 1997 Profile of Asylum Claims and Country Conditions for Russia. According to the report,

> earlier restrictions on [Jews'] freedom of worship and cultural expression have ended. Many synagogues confiscated by the Soviets have reopened. Jewish cultural and educational organizations are flourishing as never before, and ties with Israel have proliferated. . . . Jews have assumed prominent positions in the political and economic life of the country. . . . A recent survey of Jewish attitudes suggested a widespread feeling within the Jewish community that the current situation represents an improvement over the Communist past.

The report does note that anti-Semitism is revealed in some extremist publications and political dialogue, and points to specific incidents of vandalism of Jewish institutions. However, it also states that

> [o]ften the most compelling assertions in Jewish asylum claims concern repeated instances of physical mistreatment from anti-Semitic organizations and individuals. Individual instances of violence against Jews cannot be discounted. However, a claim of repeated physical abuse by anti-Semites should be examined carefully. Country conditions do not suggest that such a pattern prevails. . . . Where such mistreatment is asserted by applicants, the possibility of other motivations needs to be examined.

Thus, although the report does not suggest that living conditions for Jews were ideal, it makes clear that things were moving in the right direction. Nothing in the report intimates that following Beliaev's 1995 departure for the United States, Jews were at significant risk of suffering repeated physical attacks. *See Toptchev*, 295 F.3d at 723 (noting that although living conditions in Bulgaria were imperfect, future persecution was unlikely "given that country's continued evolution toward a democratic state").

We recognize that State Department country reports must be viewed with "healthy skepticism." *See Begzatowski*, 278 F.3d at 671; *Galina v. INS*, 213 F.3d 955, 959 (7th Cir.2000). However, we explained in *Roman v. INS*, 233 F.3d 1027, 1036 (7th Cir.2000) that notwithstanding this skepticism, a petitioner's failure to "identify any highly credible source of expert knowledge to contradict the State Department's evaluation of the likelihood of persecution" can defeat an asylum claim. *See also Toptchev*, 295 F.3d at 722 (explaining that in the absence of contrary evidence, the BIA "reasonably may rely upon the State Department's assessment of current country conditions as they relate to the likelihood of future persecution, given the Department's expertise in international affairs"); *Vaduva v. INS*, 131 F.3d 689, 691–92 (7th Cir.1997); *Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir. 1997).

Here, Beliaev has failed to cast doubt on the country report's reliability. Although he presented a May 1998 "expert" opinion provided by the Bay Area Council for Jewish Rescue and Renewal (BACJRR), the opinion does not contradict the State Department report. The BACJRR expert cautions that "individuals and groups verbally attack, harass and intimidate Jews

---

that "[e]ven if the home country situation has changed, the applicant can receive asylum if she can show some 'compelling reasons . . . arising out of the severity of the past persecution' for not returning." *Id.* at 379. We agree with the IJ's implicit finding that Beliaev's circumstances do not trigger this exception. *See Bucur v. INS*, 109 F.3d 399, 404–05 (7th Cir.1997) (reserving the exception for individuals who suffered "extreme" persecution, such as German Jews, victims of the Chinese "Cultural Revolution," and survivors of the Cambodian genocide).

wherever they are," and claims that "[t]here are not in-frequent occasions were [sic] drunks, neo-nazis or anti-Semites, hoping to get a Jew into a fight or into trouble, insult and/or harass him or her to a point that a fight indeed occurs. Subsequently the victim is fingered as the perpetrator." The opinion also describes specific violent incidents, such as an arson attack against a synagogue, the shoving of a pregnant Jewish woman while traveling on a train, and the severe beating of a rabbi by skinheads. While these incidents are certainly troubling, the opinion does not suggest that Jews are victims of harassment rising to the level of persecution, or that Jews are necessarily helpless when it comes to avoiding violent encounters.[4]

Additionally, we take judicial notice of the fact that conditions for Jews in Russia have continued to improve since Beliaev's departure. *See Dobrota v. INS,* 195 F.3d 970, 973 (7th Cir.1999) (taking judicial notice of the State Department's most recent country report on Romania); *see also Nwaokolo v. INS,* 314 F.3d 303, 308 (7th Cir.2002). According to the State Department's 2002 Religious Freedom Report for Russia, *available at* http://www.state.gov/g/drl/rls/irf/2002/13958.htm, violence against Jews is "occasional," and the Russian National Unity paramilitary organization, an anti-Semitic group to which Beliaev attributed various threats and acts of violence, "appears to have splintered and lost political influence in many regions since its peak in 1998."

In light of the above analysis, we cannot say that the IJ's decision to deny asylum was not based on substantial evidence. Additionally, because Beliaev has not satisfied the requirements for asylum, he has

similarly failed to satisfy the more demanding requirements for withholding of removal. *See Toptchev,* 295 F.3d at 724; *Ahmad v. INS,* 163 F.3d 457, 463 (7th Cir.1999).

## III. CONCLUSION

For the foregoing reasons, the BIA's decision is affirmed.

---

4. Beliaev also provided numerous news articles describing anti-Semitism in the former Soviet Union. Many of the articles predate the 1997 country report. *See Pop v. INS,* 279 F.3d 457, 462 (7th Cir.2002) (holding that articles predating a country report are not "probative of present conditions"). In any event, the articles do not suggest that Russian Jews suffer from mistreatment rising to the level of persecution.