**Pelivan CETA, Petitioner,**

v.

**John D. ASHCROFT, Respondent.**

No. 03–3066.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 6, 2004.

Decided Dec. 2, 2004.

Rehearing Denied Jan. 18, 2005.

Timothy E. Wichmer, Cofman, Wichmer, Bolourtchi & Bernhardt, St. Louis, MO, for Petitioner.

George P. Katsivalis, Department of Homeland Security Office of the District Counsel, Chicago, IL, Blair T. O'Connor, Department of Justice Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, COFFEY, and EVANS, Circuit Judges.

## ORDER

Pelivan Ceta, a citizen of Albania, arrived at Chicago's O'Hare International Airport in 1998 and immediately requested asylum or withholding of removal on the ground that he was persecuted in Albania for supporting the Democratic Party. After a hearing, an immigration judge found that Ceta was not credible and that he was removable on four different bases, including that he tried to enter the United States by using a fraudulent passport. Ceta's request for asylum was denied. The Board of Immigration Appeals subsequently concluded that the IJ's adverse credibility determination was not sustainable, but nonetheless upheld the denial of relief and the finding of a fraudulent or willful misrepresentation. In his petition for review in this court, Ceta challenges both the asylum determination and the finding regarding the fraudulent passport. We agree with Ceta that the government failed to prove that his passport was invalid and so the evidence does not support a finding that he engaged in fraudulent or willful misrepresentation, but, with these exceptions, we deny his petition for review.

On October 31, 1998, Ceta arrived at O'Hare on a flight from Italy. Upon inspection, he told immigration officials that he was seeking asylum and showed them an Albanian passport with an issue date of October 25, 1998. Ceta, however, did not have a visa. At the airport, immigration inspectors questioned him and took a sworn statement regarding his intention to apply for asylum. In this statement, Ceta recounted that he presented his Albanian passport, number 1163251, upon inspection at O'Hare. According to Ceta, he obtained the passport while in Italy with help from two friends. Ceta represented in his statement that he paid two Italians $7,000 to board the plane and that nobody checked his passport before boarding. Ceta further stated that he is a member of the Democratic Party, that he left Albania due to a war, and that he fears returning there because he will be persecuted.

The Immigration Service ultimately charged Ceta as removable on the alternative grounds that he (1) attempted to gain entry into the United States by fraudulently or willfully misrepresenting a material fact, INA § 212(a)(6)(C)(i); (2) did not have a valid, unexpired immigrant visa, *id.* § 212(a)(7)(A)(i)(I); (3) did not have a valid passport, *id.* § 212(a)(7)(B)(i)(I); and (4) did not have a valid non-immigrant visa, *id.* § 212(a)(7)(B)(i)(II). Ceta conceded removability under § 212(a)(7)(A)(i)(I) and § 212(a)(7)(B)(i)(II) because he did not have a valid visa of any kind, but he denied attempting to enter the United States by means of a fraudulent or willful misrepresentation, and denied not being in possession of a valid passport.

On April 16, 1999, Ceta formally applied for asylum. When asked on the application form whether he or a family member belonged to any political party, he responded that both he and his brother supported the Democratic Party. When asked whether any family member had ever been mistreated or threatened by Albanian authorities, Ceta answered affirmatively and, with respect to the motivation for the abuse, checked the box for "political opinion."

In a separate statement in support of his asylum application, Ceta detailed his and

his family's involvement in the Democratic Party, recounted attacks on himself and his family that he attributed to party membership, provided details about how he acquired his Albanian passport, and explained how he traveled from Albania to the United States via Italy. In particular, Ceta described a series of incidents that, he said, showed how he and his family were targeted for participating in the Democratic Party and resisting the Socialist Party. Ceta described two incidents where shots were fired toward his family home, once by men driving Socialist Party vans, and the other time by someone driving a white Mercedez–Benz. Ceta also pointed to his mother's injury in a hit-and-run incident involving a van driven by masked men, and another incident where he and a friend were chased and his friend was gunned down and killed. Ceta explained in his statement that these events came after his oldest brother, Axhem, was named chief of police for their town and followed Axhem's arrests of several criminals who were also members of the Socialist Party. Ceta further explained that these events frightened him to the point that he fled his hometown and eventually reached Italy.

As to his passport, Ceta recounted in the statement submitted with his asylum application that he received it while in Italy. According to Ceta, two friends traveled from Italy to Albania to retrieve the passport, which Axhem had obtained on his behalf. Ceta conceded in his written statement that the birth date on the passport is incorrect by two days (he gives his birth date as February 26, 1977, but the passport says February 28) but insisted that the name and photograph are his. He also submitted with his asylum application a copy of a document purportedly from the Ministry of Public Order in Albania, which (as translated) certifies that Albanian passport number 1163251 was "issued to the citizen Pelivan Ceta born on February 7, 1977" and "is a valid passport." The February 7 birth date given for Ceta on the certification differs both from the date Ceta gives and from the date on the passport.

At the February 2000 hearing on Ceta's asylum application, he maintained that his passport was valid, but the IJ found that the circumstances by which Ceta obtained it were highly irregular and that Ceta's insistence that the document was valid amounted to fraud. Ceta also recounted details of his and Axhem's involvement in the Democratic Party, as well as Axhem's position as chief of police in their hometown of Kucove. Ceta testified that "as a result" of Axhem becoming chief of police, a position that he abandoned after just one week, the family began experiencing problems.

The details of those problems track the account Ceta gave in his earlier written statement. Regarding a motive for the gunfire targeted at the family home, Ceta testified that he and Axhem were well-known in the Democratic Party but that Axhem believed the shootings to be a result of his position as the chief of police. Ceta further testified that Axhem resigned from the police department after their mother was injured, and went into hiding for 3 months. While Axhem was away, Ceta explained, the family received one letter giving them 2 weeks to locate Axhem if they wanted to avoid harm and a follow-up letter serving final notice that Ceta would be killed if Axhem did not reappear within 10 days. Ceta also recounted the story of his friend being shot and killed when they were stalked by two masked gunmen. It was fear from this event, Ceta testified, that finally prompted him to flee.

In his hearing testimony Ceta again recounted how he traveled from Italy to the United States. He said he paid two Italians $7,000 for a plane ticket and that he was escorted to the plane without showing any travel documents. Ceta testified that he fears going back to Albania and believes that, if he is returned, a couple of "longtime criminals" who are Socialists might kill him. Ceta also testified that he has been a supporter of the Democratic Party since 1993 and that for a period of time ending in 1995 he had served in the army, but that until Axhem became chief of police he had not experienced problems because of his politics.

The IJ also heard testimony from Odise Ceta, another older brother who is now legally in the United States (as is Ceta's mother), as well as Bledar Toska, a neighbor and family friend from Albania. Odise testified that just prior to the shootings at his family home he received threats about Axhem being the chief of police. Odise identified the person who threatened him as Robert Selani. Toska testified that he personally witnessed the same man shooting at Ceta's family home.

In denying Ceta's asylum application, the IJ reasoned that if Ceta's passport really was valid, as he said, then the mere fact that Ceta was able to get a passport demonstrated that the Albanian government was not interested in persecuting him. In addition, the IJ rejected Ceta's testimony as not credible because, according to the IJ, there were inconsistencies between dates appearing in documents presented by Ceta and Ceta's own account of events. As a result, the IJ concluded that Ceta had not established past persecution or a well-founded fear of future persecution.

Ceta appealed to the BIA, challenging the IJ's asylum determination and also the finding that he is removable because he tried to gain entry through a fraudulent or willful misrepresentation. As we have noted, the BIA rejected the IJ's adverse credibility finding because it could not identify any major inconsistencies involving the central elements of Ceta's claim. Still, the BIA affirmed the denial of asylum because it concluded that Ceta's evidence, even crediting his testimony, did not support a finding that he suffered past persecution. The BIA reasoned that Ceta had not linked the abuse he and his family encountered to Ceta's political opinion rather than to Axhem's status as police chief. As to the IJ's finding that Ceta tried to enter the United States by means of a fraudulent or willful misrepresentation, the BIA upheld the finding because, in its view, the evidence "raised doubts about the validity of the passport and the manner in which it was obtained."

We start with Ceta's argument that the evidence does not support the BIA's finding that he entered the United States by means of a fraudulent or willful misrepresentation and that accordingly it was error to find him inadmissible on this ground. Although the BIA based its finding on its "doubts" about the validity of Ceta's passport, Ceta maintains that the evidence points only to the conclusion that he presented a valid Albanian passport to immigration officials upon arrival in the United States. Although Ceta does not dispute that he is removable solely because he arrived without any type of visa, he continues to challenge the specific finding that he attempted to gain entry by making a fraudulent or willful misrepresentation—in the government's view, he presented a false passport to the inspectors and thereby willfully misrepresented it as genuine—because that finding will prevent him from reentering the United States in the future, even if he should otherwise qualify for a visa.

To exclude an alien for fraudulently or willfully misrepresenting a material fact, INA § 212(a)(6)(C)(i), the government must prove by clear and convincing evidence four things: (1) the person misrepresented or concealed some fact; (2) the person did so willfully; (3) the fact was material; and (4) the misrepresentation resulted in the person obtaining a visa, documentation, or entry into this country. *Kalejs v. INS*, 10 F.3d 441, 446 (7th Cir. 1993). We review the BIA's determination of removability under the substantial evidence standard and will affirm the decision unless the petitioner presented evidence so compelling that a reasonable fact finder would have been forced to find in his favor on the question of fraud or willful misrepresentation. *See Mwongera v. INS*, 187 F.3d 323, 330 (3rd Cir.1999); *Westover v. Reno*, 202 F.3d 475, 482 (1st Cir.2000).

The IJ, without citing to any evidence in the record concerning Albanian law or procedure, concluded that it would have been highly irregular for a passport to have been issued to Ceta through one of his brothers and then passed to Ceta in Italy through two friends. The IJ further concluded, again without explanation, that the source of Ceta's passport verification, a "police directorate" within the Ministry of Public Order, was also highly irregular. Based on these concerns, the IJ found that the passport was false. The BIA similarly concluded that the circumstances surrounding the issuance of the passport, as well as the different birth dates listed in Ceta's passport, his asylum application, and the certification from Albania, raised "doubts" about the validity of the passport.

Both the IJ's and the BIA's conclusions about the passport's validity rest on shaky grounds. The IJ's suspicion about the source of Ceta's passport certification is mere speculation; the government never sought to establish that the department within the Albanian government that purportedly issued the certification is not the department that would have produced such a letter; indeed, the government never sought to prove that the letter was not genuine. In addition, the IJ and the BIA have overstated the inference that reasonably can be drawn from the discrepancy in birth dates between the passport, the asylum application, and the letter certifying the passport as genuine. Obviously, if Ceta is believed about his true birth date, then there exists an *inaccuracy* in the passport, but an inaccuracy does not mean that a document is not genuine.

The BIA's view about the passport appears to mirror the position the government takes now: that it was Ceta's burden to prove that the passport was genuine. But the only authority the government cites for this position is 8 C.F.R. § 1240.8(c), which places on an alien seeking admission the burden of establishing "clearly and beyond a doubt" that he has a right to enter the United States. This provision is irrelevant; Ceta wasn't arguing at the asylum hearing that he had a right to remain in the United States; he was conceding removability. The relevant question under *Kalejs*, 10 F.3d at 446, is whether the *government* established by clear and convincing evidence that the passport is not genuine. The government did not, and thus it failed to satisfy even the first *Kalejs* requirement that Ceta must have misrepresented or concealed some fact. *See id.* The BIA, moreover, never considered whether Ceta knew about his passport's purported lack of genuineness. We recognize that an alien who knowingly enters the United States on a false passport engages in fraud and willful misrepresentation of material fact, *Esposito v. INS*, 936 F.2d 911, 912 (7th Cir.1991), but we also distinguish between a counterfeit document and the presenter's knowledge of its fraudulent character, *see Kour-*

*ski v. Ashcroft,* 355 F.3d 1038, 1039–40 (7th Cir.2004). In this case, the BIA did not find that Ceta was aware of any defect in his passport, even had there been evidence that it is not genuine. Accordingly, putting aside the question whether Ceta's passport played any role in his entering the United States, we conclude that the BIA's finding of a fraudulent and willful misrepresentation is not supported by substantial evidence. In addition, because the only evidence concerning the validity of Ceta's passport points to the conclusion that it is genuine, the BIA's determination that Ceta is removable under INA § 212(a)(7)(B)(i)(I) falls away as well.

█ That leaves Ceta's argument that the BIA's asylum determination should be overturned. Proving refugee status requires the applicant to produce evidence of a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or show past persecution (to receive a rebuttable presumption of a well-founded fear of persecution). *Ambati v. Reno,* 233 F.3d 1054, 1059–60 (7th Cir. 2000). Asylum eligibility is a factual determination and is reviewed under the substantial evidence test. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Petrovic v. INS,* 198 F.3d 1034, 1037 (7th Cir.2000). We uphold the BIA's decision here because it is supported by "reasonable, substantial and probative evidence on the record considered as a whole." *Elias,* 502 U.S. at 481 (quoting 8 U.S.C. § 1105a(a)(4)).

At the time Ceta fled Albania, the country was not politically stable. The Socialist Party captured nearly 80 percent of the parliamentary seats in the 1997 elections, which was considered a "satisfactory process" by international observers. However, the Democratic Party boycotted Parliament from October 1997 to March 1998

and again from June 1998 through year's end. A new constitution was approved by national referendum in November 1998, but the Democratic Party boycotted the drafting process and called for boycott of the referendum as well. In September 1998, a Democratic Party member of Parliament was murdered by an unknown gunman, and days of protest marches followed. An investigation, though, found no evidence of government involvement. The events described by Ceta happened during this period of political upheaval, mostly between February 1998 when Axhem was briefly police chief and April 1998 when Ceta fled his village.

However, the BIA upheld the IJ's denial of asylum on the ground that Ceta failed to link the events to his political beliefs. The BIA reasoned that, while Ceta may have been a member of the Democratic Party, his evidence never established a causal connection between the harm suffered and his political opinion, beliefs, or activities. What the BIA determined was that the entirety of the evidence showed that Axhem's arrests of criminals who happened to be Socialists, and not any political activity that Axhem or Ceta had engaged in, had triggered the chain of events described by Ceta. This harassment of Ceta and his family, the BIA concluded, was not on account of Ceta's political opinion.

To have proven that the abuse he and his family suffered was "persecution," Ceta was required to establish that the perpetrators were motivated by his political opinion. *See Elias–Zacarias,* 502 U.S. at 482. However, the weight of the evidence suggests that Ceta's abusers had another motive unrelated to Ceta's involvement in the Democratic Party. Ceta's own testimony at his asylum hearing sums up why the BIA's decision must stand: he explained that the events he described occurred after and "as a result of" Axhem's

brief tenure as police chief. Further, Ceta admitted at the hearing that even Axhem had believed that the shootings resulted from his job as the chief of police.

Because substantial evidence supports the BIA's conclusion that Ceta did not link the harm suffered by himself and his family on the one hand, and his political opinion on the other, the BIA's finding as to asylum must be sustained. And since Ceta did not meet his burden of showing a well-founded fear of persecution for obtaining asylum, he necessarily failed to meet the higher burden of showing the probability of persecution required to qualify for withholding of removal. *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir.2002).

Accordingly, Ceta's petition is GRANTED insofar as he seeks to overturn the determination of removability under INA § 212(a)(6)(C)(i) and § 212(a)(7)(B)(i)(I). But in all other respects, the petition for review is DENIED.